UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

EUGINIA COPPOLA,

                               Plaintiff,

        -against-                             1:17-CV-1032 (LEK/ATB)

TOWN OF PLATTEKILL, *et al.*,

                               Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Euginia Coppola brings this action against Health Alliance Hospital Broadway Campus; Access: Support for Living, Inc.; the Town of Plattekill, New York; Ulster County, New York; and numerous employees of each of these defendants. Dkt. No. 42 ("Amended Complaint"). Plaintiff alleges violations of the Fourth and Fourteenth Amendments of the United States Constitution in connection with her arrest and involuntary hospitalization at Health Alliance Hospital on November 19, 2016. Id. ¶ 1. Plattekill, Plattekill Police Chief Joseph Ryan, and Plattekill police officers John Rafferty and Brian Benjamin (together, "Plattekill Defendants") move to dismiss the claims alleged against them. Dkt. Nos. 60 ("Plattekill Motion"), 60-1 ("Plattekill Memorandum"). Ulster County, Ulster County Sheriff Paul Van

Blarcum,[1] and Ulster County deputy John McGuire[2] (together, "Ulster Defendants") also move to dismiss all claims alleged against them except for the unreasonable search and seizure claims against McGuire. Dkt. Nos. 50 ("Ulster Motion"), 50-1 ("Ulster Memorandum"); see also Am. Compl. ¶ 47. Plaintiff moves to file a second amended complaint. Dkt. Nos. 56-2 at 12–13 ("Amendment Motion"); PSAC. For the reasons that follow, each motion is granted in part and denied in part.

## II.    BACKGROUND

### A.  Factual History

The facts described in this section are drawn from the Amended Complaint. Plaintiff is a fifty-five year old female who lives in Highland, New York. Am. Compl. ¶ 6. Stone walls surround her property. Id. ¶ 23. Around April 2016, Plaintiff observed that large stones had been removed from the walls on her property, and she reported this to the Plattekill Police Department. Id. ¶¶ 25–26. In September 2016, Plaintiff again observed that stones had been removed from the walls, and she filed a second report with the Department. Id. ¶ 27. Plaintiff called the Department again on November 17, 2016, after seeing "four people on her property." Id. ¶ 31. Ryan then told Plaintiff that "her case was closed." Id. Two days later, Plaintiff called the Ulster County

---

[1]  The Amended Complaint refers only to a "Paul Van Blarcum," Am. Compl., but Plaintiff's proposed second amended complaint, Dkt. No. 56-3 ("PSAC"), refers to this defendant as both "VanBlarcum", id. ¶ 60, and "Van Blarcum," id. ¶ 52. Because the captions of the Amended Complaint and the PSAC both refer to him as "Van Blarcum," the Court will address him as Van Blarcum. The Court urges Plaintiff's counsel to be more diligent in future filings.

[2]  The Amended Complaint refers only to a "Deputy John McQuire," Am. Compl. However, because the Ulster Defendants refer to this defendant as John McGuire, e.g., Ulster Mem. at 1, and because the PSAC corrects the spelling of his last name to McGuire, e.g., PSAC ¶ 13, the Court will refer to him as McGuire.

Sheriff's Department "to report a crime occurring on her property." Id. ¶ 32. McGuire, Rafferty,

Benjamin, and two agents from Access: Support for Living responded to Plaintiff's call and

arrived at her property in a patrol car. Id. ¶¶ 33, 36. The three officers "started treating Plaintiff of

[sic] being delusional." Id. ¶ 34. Plaintiff maintains that she did not behave in a threatening

manner. Id. ¶ 52.

"Plaintiff asked the officers to leave her property" and attempted to return inside her

house, but McGuire "grabbed [her], twisted [her] back and arms, . . . and then handcuffed [her]."

Id. ¶ 35. He then frisked her, "yanked on [her] pants, and put [her] in the marked patrol car." Id.

¶ 36. Rafferty said that the officers had to "take Plaintiff's firearm." Id. Plaintiff asked for water,

but "[t]he officers replied that [she] could not get . . . water until she disclosed the location of her

firearm." Id. ¶ 37. Plaintiff revealed the location of her gun, but "told the officers that they did

not have permission to go into her house." Id. The officers entered her house while she was in the

patrol car, and took her gun. Id. ¶¶ 38, 64. "The officers [then] put Plaintiff into an ambulance

and transported [her] to" Health Alliance Hospital. Id. ¶ 69. "Plaintiff's blood and urine were

taken by the [h]ospital" and Plaintiff remained in the hospital "overnight for mental health

evaluation." Id. ¶¶ 44–45. The evaluation revealed that Plaintiff did not suffer from mental

illness, and that she was not under the influence of drugs or alcohol. Id. ¶¶ 41, 44. She was

released from the hospital on November 20, 2016. Id. ¶ 41.

**B. Procedural History**

Plaintiff commenced this action on September 3, 2017. Dkt. No. 1 ("Complaint"). She

filed her Amended Complaint on November 6, 2017. Am. Compl. The Amended Complaint

alleges, under 42 U.S.C. § 1983, unreasonable search and seizure, false imprisonment, municipal

3

liability, and substantive due process claims in connection with her detention and hospitalization on November 19, 2016. Am. Compl. ¶¶ 46–175. The Plattekill Defendants moved to dismiss the claims alleged against them, Plattekill Mot.; Plattekill Mem., as did the Ulster Defendants, with the exception of the unreasonable search and seizure claims against John McGuire, Ulster Mot; Ulster Mem. Plaintiff responded to each motion, Dkt. Nos. 56-2 ("Ulster Response"), 62-2 ("Plattekill Response"), and the Plattekill and Ulster Defendants replied, Dkt. Nos. 58 ("Ulster Reply"), 67 ("Plattekill Reply"). Plaintiff also moved to file a second amended complaint. Am. Mot.; PSAC.

## III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the nonmoving party. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is

unable to infer more than the mere possibility of the alleged misconduct based on the pleaded

facts, the action is subject to dismissal. Id. at 678–79.[3]

## IV.    DISCUSSION

### A.  Unreasonable Search and Seizure Claims

Plaintiff alleges that Defendants violated her Fourth and Fourteenth Amendment rights by

performing an "unreasonable search and seizure." Am. Compl. ¶ 47. Plaintiff does not clearly

state the legal theories underlying these claims. However, based on the pleading's factual

allegations, e.g., Am. Compl. ¶¶ 53–62, and the briefing by the parties, e.g., Ulster Mem. at 11;

Ulster Resp. at 11, it appears that Plaintiff's unreasonable search and seizure cause of action

involves false arrest claims and claims related to the officers' warrantless search of her house and

seizure of her gun. The Court analyzes each claim below.

### 1.  False Arrest Claims[4]

_____

[3]  Plattekill Defendants have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plattekill Mem. at 1. "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

[4]  Plaintiff alleges both false arrest and false imprisonment claims. Am. Compl. ¶¶ 52–69, 113–30. The two claims are based on identical factual allegations. Id. Under New York law, the elements of false imprisonment and false arrest claims are identical. Biswas v. City of New York, 973 F. Supp. 2d 504, 515 (S.D.N.Y. 2013). Plaintiff maintains, confusingly, that her false imprisonment and false arrest claims are distinct because the "false arrest" claim concerns her initial detention in the patrol car, while her false imprisonment claim concerns her "confine[ment]" at the hospital." Ulster Resp. at 12. However, this distinction is artificial. Both Plaintiff's initial detention and her overnight hospitalization are analyzed identically whether alleged as a false arrest or false imprisonment claim. Because the claims are identical, the Court treats these two causes of action as one false arrest claim. See, e.g., Williams v. City of New York, No. 10-CV-2676, 2012 WL 511533, at *2 (E.D.N.Y. Feb. 15, 2012) (stating that, because the plaintiff's false imprisonment and false arrest claims were identical, the court would "treat them as a single claim for false arrest"); Jackson v. City of New York, 29 F. Supp. 3d 161, 169

Plaintiff alleges that Rafferty, Benjamin, and McGuire arrested her on November 19, 2016 without probable cause, in violation of the Fourth and Fourteenth Amendments. Am. Compl. ¶¶ 48–69. In order to state a claim pursuant to § 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state . . . law.'" Velez v. Levy, 401 F.3d 75, 85 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980)). State action is an essential element of a § 1983 claim. Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982); see also Hudgens v. NLRB, 424 U.S. 507, 513 (1976) ("It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."). Moreover, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated" a federal right. Iqbal, 556 U.S. at 676.

In this Circuit, false arrest claims are evaluated using "the law of the state in which the arrest occurred." Russo v. City of Bridgeport, 479 F.3d 196, 203 (2d Cir. 2007). "Under New York law, a plaintiff claiming false arrest 'must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Warr v. Liberatore, 270 F. Supp. 3d 637, 645 (W.D.N.Y. 2017) (quoting Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003)).

---

n.8 (E.D.N.Y. Mar. 17, 2014) (finding that the plaintiff's false arrest and false imprisonment claims were "duplicative," and "constru[ing] them to set forth one claim for false arrest").

Plattekill Defendants argue that Plaintiff fails to state a false arrest claim because her detention was privileged under New York law and because Rafferty and Benjamin's participation in Plaintiff's detention did not rise to the level of state action. Plattekill Mem. at 6–10. Plattekill Defendants also argue that the Plattekill officers are entitled to qualified immunity on this claim. Id. at 16–19.

### a.  Privilege

Plattekill Defendants argue, Plattekill Mem. at 9, that Plaintiff's arrest was privileged pursuant to New York Mental Hygiene Law § 9.41, which states that a "police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." Mental Hygiene Law § 9.01 defines the phrase "likely to result in serious harm" as

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

"Probable cause to believe that the criteria for a mental health arrest pursuant to [this provision] have been met is a defense to a false arrest claim arising from such an arrest." Heller v. Bedford Cent. Sch. Dist., 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015) (citing Kerman v. City of New York, 261 F.3d 229, 235 n.8 (2d Cir. 2001)). "[A] showing of probable cause in the mental health seizure context requires only a 'probability or substantial' chance of dangerous behavior, not an actual showing of such behavior." Kusak v. Klein, No. 11-CV-6557, 2015 WL 510053, at *5

(W.D.N.Y. Feb. 6, 2015) (alteration in original) (quoting Hoffman v. County of Delaware, 41 F. Supp. 2d 195, 209 (N.D.N.Y. 1999)).

Treating the factual allegations in the Amended Complaint as true, the officers on Plaintiff's property did not have probable cause to believe that she was dangerous to herself or others. Plaintiff maintains that did not behave threateningly, was not under the influence of drugs or alcohol, and "knew exactly where she was." Am. Compl. ¶¶ 40–42. She states that McGuire, Benjamin, and Rafferty sent her to the hospital after she made numerous reports to the Plattekill Police Department and to the Ulster County Sheriff's Department. Id. ¶¶ 25–29. Even if the officers considered these reports to be irritating or implausible, it does not appear that Plaintiff ever threatened to harm anybody or to commit suicide when making these reports or when speaking to the officers outside of her house. See Greenaway v. County of Nassau, 97 F. Supp. 3d 225, 233–34 (E.D.N.Y. 2015) (holding that the defendants did not establish that the plaintiff's behavior created a likelihood of serious harm to himself or others where the plaintiff "engaged in 'bizarre and unreasonable' behavior, including stripping naked and rubbing paint on [himself] . . . and making gestures that some officers interpreted as 'threatening'").

Moreover, even if Plaintiff, as the officers allegedly posited, "admitted to having a gun and shooting it off regularly," Am. Compl. ¶ 45, the mere fact that she owned a weapon and had fired it does not indicate that she was likely to use the gun to injure herself or others. She could use the gun, for instance, at a shooting range. Cf. Hoffman, 41 F. Supp. 2d at 209–10 (finding that psychiatric center employee had probable cause to issue order to seize the plaintiff where the plaintiff "threatened violence towards certain city officials, . . . was known to have a large collection of firearms and . . . was believed to have sandbagged his apartment as protection from

8

an attack").

For these reasons, Plaintiff plausibly alleges that her overnight detention for psychiatric evaluation was not privileged.

### b. State Action/Personal Involvement

Plattekill Defendants also argue that the false arrest claim against Benjamin and Rafferty must fail for lack of state action. Plattekill Mem. at 5–8. However, the Court concludes, with little difficulty, that their conduct on Plaintiff's property satisfied § 1983's state action requirement. An individual performs state action "when he exercises 'some right or privilege created by the State . . . or by a person for whom the State is responsible,' and is 'a person who may fairly be said to be a state actor.'" Marino v. Jonke, No. 11-CV-430, 2012 WL 1871623, at *6 (S.D.N.Y. Mar. 30, 2012) (quoting Lugar, 457 U.S. at 937). "Generally, a public employee acts under color of state law when he acts in his official capacity or exercises his responsibilities pursuant to state law." Id; see also Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir. 1994) (observing that a police officer performs state action when he "invokes the real or apparent power of the police department"). Benjamin and Rafferty are public employees, and they drove to Plaintiff's property in response to a 911 call, Am. Compl. ¶¶ 48–49, which suggests that they encountered Plaintiff in their official capacity. The actions attributable to Benjamin and Rafferty during this encounter, therefore, constitute state action. Plattekill Defendants cite Barrett v. Harwood, 189 F.3d 297 (2d Cir. 1999), in support of their argument. Mem. at 7. However, Barrett is inapposite because it found only that a police officer's "mere presence" to keep the peace at the scene of a repossession did not "convert[] a private repossession into state action." 189 F.3d at 301–02. It

did not state that a police officer who plays a secondary role in an arrest has not performed state action.

It may be that Plattekill Defendants confused state action with personal involvement, which a plaintiff must also allege to state a § 1983 claim. E.g., Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). To the extent that Plattekill Defendants intended to argue that Plaintiff's false arrest claims against Benjamin and Rafferty must fail for lack of personal involvement, e.g., Plattekill Mem. at 8 ("[T]he Amended Complaint does not state that any [Plattekill] Defendant ever threatened to arrest Plaintiff, has never [sic] arrested Plaintiff, nor in any way aided in Plaintiff being handcuffed."), this argument, too, is meritless.

In Colon v. Coughlin, the Second Circuit held that

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. Plaintiff alleges that "the officers put [her] in an ambulance and transported [her] to" Health Alliance Hospital after finding her gun inside her house. Am. Compl. ¶¶ 33, 35–36, 69. Plaintiff's reference to "the officers" suggests that she alleges that each officer present on her property—including Benjamin and Rafferty—participated in placing her in the ambulance and sending her to the hospital. See Messina v. Mazzeo, 854 F. Supp. 116, 125 (E.D.N.Y. 1994) (interpreting allegation regarding the use of excessive force by "defendant [p]olice [o]fficers" as

an allegation "that all of these individual police officers participated in using excessive force when they arrested" the plaintiff); see also Silicon Knights, Inc. v. Crystal Dynamics, 983 F. Supp. 1303, 1309 (N.D. Cal. 1997) ("Courts have denied motions to dismiss a complaint against individual defendants where the complaint alleged that all defendants engaged in the alleged tortious acts, although the complaint did not set forth the specific acts committed by each defendant."). Plaintiff, therefore, sufficiently alleges that Benjamin and Rafferty "participated directly in" her false arrest. Colon, 58 F.3d at 873.

### c. Qualified Immunity

The doctrine of qualified immunity entitles public officials to freedom from liability for civil damages, as a result of the consequences of the performance of their discretionary duties, when "their conduct does not violate clearly established rights of which a reasonable person would have been aware." Zalaski v. City of Hernandez, 723 F.3d 382, 388 (2d Cir. 2013). "The determination of qualified immunity depends both on the specific facts of an official's actions—e.g., 'what situation confronted [him], what acts he performed, and his motivation in performing those acts'—and on the clarity of the legal rules governing that particular conduct." Village of Freeport v. Barrella, 814 F.3d 594, 609 (2d Cir. 2016) (alteration in original) (quoting Lore v. City of Syracuse, 670 F.3d 127, 162 (2d Cir. 2012)). In deciding whether an officer's actions were objectively reasonable in light of existing law, "the inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct. Rather, '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." Zalaski, 723 F.3d at 389 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

As stated above, Plaintiff successfully alleges a false arrest claim based on her detention and her subsequent hospitalization. Benjamin and Rafferty are entitled to qualified immunity if it would not necessarily be clear to a reasonable officer that" they did not have probable cause to detain Plaintiff for psychiatric evaluation. The Court finds, based on the facts as alleged in the Amended Complaint, that no reasonable officer could believe that they had probable cause, and that Plaintiff alleges that Benjamin and Rafferty violated clearly established law by detaining her.

In Kerman v. City of New York, the Second Circuit evaluated the constitutionality of plaintiff Kerman's involuntary hospitalization, and whether "reasonable officers could . . . disagree as to whether Kerman presented a threat of harm to himself or others." 261 F.3d at 241. Police officers responded to a 911 call stating that Kerman was "off his medication and acting crazy and possibly had a gun." Id. at 233. Kerman stated "that he was calm during most of his encounter" with the officers. Id. at 240–41. The officers handcuffed Kerman and searched his apartment for a gun for an hour before placing him on an ambulance and sending him to a hospital. Id. at 233–34. Kerman raised an unlawful seizure claim against one of the officers. Id. at 240. Id. Because, based on Kerman's version of events, his "conduct" did not "demonstrate[] a dangerous mental state," and because the officers "failed to reasonably investigate his mental state" in the hour that they spent searching his apartment, the court held that a genuine issue of material fact existed regarding whether the defendant officer was entitled to qualified immunity on Kerman's unlawful seizure claim. Id. at 241.

The result in Kerman suggests that Benjamin and Rafferty are not entitled to qualified immunity at this stage. Plaintiff, like Kerman, claims that she did not exhibit threatening behavior toward the officers during their encounter. Am. Compl. ¶¶ 40–42. Moreover, while the

officers in <u>Kerman</u> at least arrived at Kerman's apartment in response to a 911 call attesting to his mental instability and dangerousness, the Amended Complaint suggests that Benjamin and Rafferty had *no* basis to believe that Plaintiff presented a threat to herself or others. In fact, Plattekill Defendants never identify what justified Plaintiff's detention, let alone facts suggesting that they reasonably believed that she presented a threat to herself or others. The Court cannot say, therefore, that a reasonable officer could have found probable cause to detain Plaintiff for psychiatric evaluation. Accordingly, the Court denies Plattekill Defendants' Motion to dismiss Plaintiff's false arrest claims against Benjamin and Rafferty on the basis of qualified immunity.

### 2. *Claims Relating to the Search of Plaintiff's House*

Plaintiff alleges that, after McGuire handcuffed her and placed her in the patrol car, McGuire, Benjamin, and Rafferty unlawfully entered her house without a warrant and seized her gun. Am. Compl. ¶¶ 37–38, 64. Plattekill Defendants argue that Benjamin and Rafferty did not engage in "state action" with respect to the search of Plaintiff's home and the seizure of her gun, and that they are entitled to qualified immunity with respect to this claim. Plattekill Mem. at 7–8, 16–19.

### a. State Action/Personal Involvement

As observed in the false arrest discussion, Plattekill Defendants' state action argument apparently confuses the questions of whether a state official has engaged in "state action" and whether a state actor is personally involved in a constitutional violation. In any event, Plattekill Defendants argue that Benjamin and Rafferty's participation in the search of Plaintiff's house and the seizure of her gun was too minimal to sustain a finding of liability under § 1983. Plattekill Mem. at 6–7. Their argument, however, consists solely of the observation that

13

"Plaintiff claims that an unidentified law enforcement officer retrieved her firearm." Id. at 6.
However, the Amended Complaint never makes such an amorphous allegation. Rather, Plaintiff
states that Rafferty declared that the officers needed to take Plaintiff's gun, Am. Compl. ¶ 36,
which suggests that he instigated the search and seizure. Also, Plaintiff states that she asked for a
glass of water, but "[t]he officers" refused to give her water until she told them where she kept
her gun. Id. ¶ 37. Finally, Plaintiff alleges that "[t]he officers entered [her] house, searched the
house, and took [her] firearm." Id. ¶ 38.

As stated in the false arrest discussion, Plaintiff sufficiently alleges that Benjamin and
Rafferty engaged in state action by arriving on her property in response to her 911 call.
Moreover, the officers "invoke[d] . . . the authority of the" Plattekill Police Department when
they entered Plaintiff's property to search for her gun. Pitchell, 13 F.3d at 548. Plaintiff also
sufficiently alleges Benjamin and Rafferty's personal involvement. Rafferty instigated the seizure
of Plaintiff's gun and, as with Plaintiff's false arrest claim, she alleges that each officer present
on her property told her to reveal the location of her gun, and that each officer entered her home
and searched for her gun. Therefore, Plaintiff sufficiently alleges that Benjamin and Rafferty
directly participated in the search of her home and the seizure of her gun.

### b. Qualified Immunity

Plattekill Defendants argue that Benjamin and Rafferty are entitled to qualified immunity
on Plaintiff's claims related to the allegedly unlawful search of her home and seizure of her gun.
Plattekill Mem. at 16–19. The right to be free from warrantless searches and seizures, subject to
limited exceptions, is clearly established. The Fourth Amendment protects persons from
"unreasonable searches and seizures." U.S. Const. amend. IV. "The 'physical entry of the home

14

is the chief evil against which the wording of the Fourth Amendment is directed.'" <u>Montanez v. Sharoh</u>, 444 F. App'x 484, 486 (2d Cir. 2011) (quoting <u>Payton v. New York</u>, 445 U.S. 573, 585 (1980)). "Thus, '[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" <u>Id.</u> (alteration in original) (quoting <u>Payton</u>, 445 U.S. at 586). Therefore, officers may not enter a residence without a warrant unless certain limited exceptions apply. <u>Id.</u> at 486–87. For instance, officers may enter a residence without a warrant if "exigent circumstances" necessitate their intervention. <u>Kentucky v. King</u>, 563 U.S. 452, 461 (2011). Officers may also enter a residence with "consent to search from an individual authorized to give it." <u>Cullen v. Vill. of Pelham Manor</u>, No. 03-CV-2168, 2009 WL 1507686, at *11 (S.D.N.Y. May 28, 2009); <u>see also</u> <u>Koch v. Town of Brattleboro</u>, 287 F.3d 162, 167, 169 (2d Cir. 2002) (listing consent and the existence of exigent circumstances as two exceptions to the warrant requirement).

Plattekill Defendants do not appear to dispute that the right to be free of warrantless searches of one's home, subject to limited exceptions, is clearly established. Instead, they argue that reasonable officers could have believed that (1) Plaintiff consented to the search of her house, (2) they "had probable cause to enter [the home] and seize [Plaintiff's] firearm since she had already been" detained, and (3) they "had probable cause to believe that the mental health of Plaintiff could have led to her harming herself or others with her firearm once she was released from her [sic] for mental health evaluation." Plattekill Mem. at 18. The Court addresses each of these arguments below.

###### i. Consent

Plattekill Defendants argue that a reasonable officer could believe that Plaintiff consented to the entry into and search of her house because she "identified the location of her firearm for retrieval." Plattekill Reply at 6. It is true that "consent may be inferred from an individual's words, gestures, or conduct," United States v. Grant, 375 F. App'x 79, 80 (2d Cir. 2010) (summary order) (quoting United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981)). Moreover, some courts have found implied consent to a search when a person informs police officers of the location of their firearm. E.g., United States v. Wilson, 914 F. Supp. 2d 550, 566 (S.D.N.Y. 2012). However, to determine whether someone consented to a search, "the Court must ask: 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" United States v. Long Huang You, 198 F. Supp. 2d 393, 396 (S.D.N.Y. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). While Plaintiff allegedly revealed the location of her gun to the officers in exchange for water, she then "told the officers that they *did not have permission* to get into her house." Am. Compl. ¶ 37. The Court rejects the proposition that, notwithstanding Plaintiff's explicit refusal of consent, a reasonable officer could have interpreted Plaintiff's disclosure of the location of her gun in exchange for a drink of water as her implied consent to the entry and search of her home and the seizure of her gun.

Plattekill Defendants also state, "Plaintiff admits that after she was" placed into the patrol car, "she requested to be let into her house and was granted that request," and the officers searched for her gun while she was inside her house. Plattekill Mem. at 6 (citing Am. Compl. ¶¶ 37–38). It is unclear whether this is intended to suggest that a reasonable officer could believe that Plaintiff impliedly consented to a search of her house. In any case, this interpretation of the

16

Amended Complaint is either the product of a willful misrepresentation of the pleading's content, or Plattekill Defendants' counsel's inattention to detail. The cited paragraphs of the Amended Complaint state that Plaintiff told the officers where her gun was, that they could not enter her house, and that, despite Plaintiff's objections, the officers entered and searched her home. Am. Compl. ¶¶ 37–38; see also id. ¶¶ 63–64 (reaffirming that, while the officers searched Plaintiff's house, she was still handcuffed in the back of the patrol car). Plattekill Defendants' insistence to the contrary is nowhere to be found in the pleading.

In conclusion, the Court finds that no reasonable officer could believe that Plaintiff consented to the search of her home or seizure of her gun.

### ii. Exigent Circumstances

Plattekill Defendants argue that reasonable officers could believe that their search of Plaintiff's home was justified because Plaintiff could have used the gun to "harm[] herself or others . . . once she was released from her [sic] for mental health evaluation." Plattekill Mem. at 18. This argument is meritless. As stated above, no reasonable officer could find, based on the facts as alleged in the Amended Complaint, that Plaintiff posed a threat to herself or others. More importantly, even if Plaintiff did behave threateningly, there is no basis to support the conclusion that this threat was sufficiently urgent to justify the warrantless entry and search of her home.

"[T]he core question" when determining whether exigent circumstances permit the warrantless entry and search of a residence "is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer . . . to believe that there was an 'urgent need to render aid or take action.'" Rivera ex rel. Rivera v. Leto, No. 04-CV-7072, 2008 WL 5062103, at *3 (S.D.N.Y. Nov. 25, 2008) (quoting United States v. Klump, 536 F.3d 113,

17

117–18 (2d Cir. 2008)). The "'mere possibility of danger' does not 'make it objectively reasonable to believe that the circumstances were exigent.'" Id. (quoting Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir. 1991)). The Second Circuit has observed that the exigent circumstances exception may apply, for instance, when "police officers . . . are in hot pursuit of a fleeing suspect," or when officers must enter a residence "to prevent the imminent destruction of evidence." United States v. Moreno, 701 F.3d 64, 72–73 (2d Cir. 2012) (quoting King, 563 U.S. at 460–61). The exception also allows officers to enter a residence "without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (quoting Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971)). In light of the "numerous and consistent Second Circuit decisions" discussing the exigent circumstances exception, the "constitutional right not to have [one's] home entered and searched without a warrant in the absent of exigent circumstances," and the law governing the applicability of this exception, are clearly established. Rivera, 2008 WL 5062103, at *7.

Here, Plattekill Defendants do not seriously contend that an exigent threat justified their entry into Plaintiff's home and the search and seizure of her gun. The officers were not rendering urgent assistance, preventing the destruction of evidence, or pursuing a fleeing felon. Moreover, Plattekill Defendants allegedly entered and searched Plaintiff's house while she was handcuffed in a patrol car. Thus, even if Plaintiff *was* inclined to use her gun to harm herself or others—a proposition for which the Court finds no support in the Amended Complaint—there was no *imminent* threat of her using that gun when the officers entered her house. See United States v. Atkinson, 653 F. Supp. 668, 677 (S.D.N.Y. 1987) ("The mere existence of a weapon,

without . . . [a] reasonable belief in[] an imminent threat posed by the weapon, does not justify a warrantless intrusion under the exigency test."); cf. United States v. Guadalupe, 363 F. Supp. 2d 79, 82 (D. Conn. 2004) (finding that exigent circumstances permitted officers to enter an apartment to retrieve a gun because the officers were "engaged in a struggle with [the d]efendant" and the defendant threw his "gun into an apartment where his companion had just taken refuge"). The Court concludes that the facts alleged in the Amended Complaint provide no basis for a reasonable officer to believe that exigent circumstances justified the warrantless entry and search of Plaintiff's home or the seizure of her gun.

### iii.  Search Incident to Arrest

Plattekill Defendants also support their qualified immunity defense by arguing that a reasonable officer could believe that they had "probable cause to enter Plaintiff's residence and seize her firearm since she had already been placed into the custody of the Ulster County Sheriff's Department." Plattekill Mem. at 18. This argument is unavailing. While a warrantless search may be valid if it is performed "incident to an arrest," Vale v. Louisiana, 399 U.S. 30, 33 (1970), this exception is clearly inapplicable here. It has been the case for decades that "a search incident to arrest may only include 'the arrestee's person and the area within his immediate control,'" which is "the area from which he might gain possession of a weapon or destructible evidence." Arizona v. Gant, 556 U.S. 332, 339 (2009) (quoting Chimel v. California, 395 U.S. 752 (1969)). Moreover, "[i]f a search of a house is to be upheld as incident to an arrest, that arrest must take place inside the house, not somewhere outside—whether two blocks away, twenty feet away, or on the sidewalk near the front steps." Vale, 399 U.S. at 33–34.

Plaintiff alleges that she was handcuffed in the back of a patrol car when the officers searched her house for her gun. Because she was far from her gun and immobilized when the search took place, no reasonable officer would think that Plaintiff could "gain possession of" her gun from her location. See United States v. Blue, 78 F.3d 56, 60 (2d Cir. 1996) ("[I]n determining whether or not an area is within the arrestee's 'immediate control,' we consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person") (internal citations omitted); United States v. Cancel, 167 F. Supp. 3d 584, 591 (S.D.N.Y. 2016) (finding that an officer's search of an arrestee's bag was not incident to arrest because the arrestee was "handcuffed behind his back," "remained at least one bench seat away from the bag," and was "flanked" by two police officers).

Moreover, the holding in Vale—that a search of a home is not incident to an arrest if the arrest takes place *outside* the home—clearly forecloses this exception's applicability to the officers' search. Plattekill Defendants make *no* mention in their briefing of Vale or any of the longstanding rules regarding the search incident to arrest exception. Instead, they assert that a reasonable police officer could believe that it was lawful to enter and search Plaintiff's home without a warrant simply because she was detained. Plattekill Mem. at 18. This argument borders on frivolous. The proposition that a reasonable officer could believe that he or she has unfettered discretion to search a residence simply because the occupant of that residence has been arrested ignores decades of Fourth Amendment jurisprudence, which courts have shaped around the notion that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Montanez, 444 F. App'x at 486. The Court finds that no reasonable

officer could believe that Plaintiff's detention justified the warrantless entry and search of her home.

Because Plaintiff alleges that Benjamin and Rafferty violated clearly established law when they entered and searched her home and seized her gun without a warrant, they are not entitled to qualified immunity on this claim. Accordingly, Plaintiff's unreasonable search and seizure claims against Benjamin and Rafferty survive dismissal.

### B.  Monell Claims[5]

Plaintiff alleges Monell claims against Ulster County and Plattekill, and against Van Blarcum and Ryan in their official capacities. Am. Compl. ¶¶ 131–48; see also Ulster Resp. at 8 (citing Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658 (1978)). Both Plattekill and Ulster Defendants argue that Plaintiff fails to state a Monell claim because she does not adequately plead that the alleged constitutional violations that McGuire, Benjamin, and Rafferty carried out were sanctioned by an official policy or custom. Plattekill Mem. at 10–14; Ulster Mem. at 6–10.

To establish a Monell claim under § 1983, a plaintiff must plead and prove that the deprivation of his constitutional rights was "caused by a governmental custom, policy, or usage of the municipality." Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012) (citing Monell, 436 U.S. at 690–91). First, a plaintiff may show the existence of a municipal policy or custom by alleging

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making

---

[5]  As part of her Monell claim, Plaintiff also argues that McGuire, Benjamin, and Rafferty violated her constitutional rights pursuant to policies that Van Blarcum and Ryan formulated. Am. Compl. ¶¶ 132–48. However, because the PSAC adds factual detail to this argument, PSAC ¶ 150, the Court addresses this argument in its discussion of Plaintiff's Amendment Motion.

authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff and others encountering those subordinates.

McLennan v. City of New York, 171 F. Supp. 3d 69, 94 (S.D.N.Y. 2016). "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985).

Plaintiff first alleges that Ulster County and Plattekill "permit and tolerat[e] a practice of warrantless detaining, searching, seizing, and involuntarily confining individuals and warrantless entry and searching residences of individuals believed to have made a false report." Am. Compl. ¶¶ 137, 145. However, "mere allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." Triano v. Town of Harrison, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012); see also Duncan v. City of New York, No. 11-CV-3826, 2012 WL 1672929, at *2–3 (E.D.N.Y. May 14, 2012) (finding that "boilerplate statements" that "New York City has a 'custom and policy of making illegal and false arrests with excessive force'" were insufficient to state a municipal liability claim). Plaintiff's more detailed description of the constitutional violations that Benjamin, Rafferty, and McGuire allegedly committed does not allege the existence of a municipal policy or custom, either, because "it is well established that a single incident does not give rise to an unlawful practice by subordinate officials 'so permanent and

22

well-settled as to constitute custom or usage.'" <u>Plair v. City of New York</u>, 789 F. Supp. 2d 459, 470 (S.D.N.Y. 2011) (quoting <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988)).

Second, Plaintiff argues that Mcguire, Benjamin, and Rafferty violated her constitutional rights pursuant to policies that Van Blarcum and Ryan formulated. Am. Compl. ¶¶ 134–35. As noted above, a plaintiff may establish the existence of a municipal policy or custom by alleging "actions or decisions made by municipal officials with decision-making authority." <u>McLennan</u>, 171 F. Supp. 3d at 94. "[W]hether an official ha[s] final policymaking authority is a question of state law." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986)). Moreover, "where a plaintiff relies . . . on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57–58 (2d Cir. 2000).

Plaintiff does no more than assert that Ryan and Van Blarcum had "final-decision making," and that Van Blarcum "was responsible for establishing final law enforcement policies." Am. Compl. ¶¶ 134–35, 146. These minimal, conclusory statements fall far short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers. Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim. Therefore, she fails to allege that Van Blarcum or Ryan are final policymakers, and her <u>Monell</u> claims against Ulster County and Plattekill must be dismissed. <u>See</u> <u>W.A. v. Hendrick Hudson Cent. Sch. Dist.</u>, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a <u>Monell</u> claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,'" but "cite[d] no state or county law that actually vests

23

Coughlin with final policymaking authority over the maintenance and protection of student records"); Canner v. City of Long Beach, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' Monell claim where the "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker").

Finally, Plaintiff brings this action against Van Blarcum and Ryan in their individual and official capacities. Am. Compl. As will be explained below, Plaintiff may proceed with certain individual capacity claims against these defendants. "However, absent a claim seeking injunctive relief to remedy an *ongoing* violation of federal law, 'a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself.'" Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 498 (N.D.N.Y. 2017) (quoting Lin v. County of Monroe, 66 F. Supp. 3d 341, 353 (W.D.N.Y. 2014)). "Indeed, 'district courts have [regularly] dismissed official capacity claims against individuals as redundant or unnecessary where Monell claims are asserted against an entity." Id. at 498–99. This reasoning is applicable here. Plaintiff's official capacity claims against Van Blarcum and Ryan do not seek relief from an ongoing deprivation of her rights, and are thus duplicative of her Monell claim. Accordingly, the Court dismisses the official capacity claims against Van Blarcum and Ryan.

### C. Amendment Motion[6]

Plaintiff filed an Amendment Motion and submitted the PSAC, which corrects various misspellings of McGuire and Rafferty, e.g., PSAC ¶ 48, adds more facts detailing the involvement of Health Alliance Hospital and Access: Support for Living, Inc., id. ¶¶ 174–76, 189, 196–97, and adds allegations detailing Van Blarcum and Ryan's involvement in her alleged false arrest and in the search of her home, id. ¶¶ 34–38, 55–59, 150–54, 165–69.

Where, as here, a party has amended its pleading once, Rule 15 of the Federal Rules of Civil Procedure provides that a party may amend its pleading again "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a). "[L]eave to amend should be freely given . . . '[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, . . . [or] futility of amendment.'" Rusyniak v. Gensini, 629 F. Supp. 2d 203, 212 (N.D.N.Y. 2009) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to" Rule 12(b)(6). Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002). "The test then with respect to futility is whether or not the proposed amendment states a claim upon which relief can be granted." Henriquez v. Kelco Landscaping, Inc., 299 F.R.D. 376, 378 (E.D.N.Y. 2014) (citing Lucente, 310 F.3d at 258).

---

[6] Plaintiff's Amendment Motion is appended to the end of the County Response, and she attached the PSAC as an exhibit in the same submission. At the end of the Town Response, Plaintiff includes a similar paragraph seeking leave to amend, Dkt. No. 62-2 at 16–17 ("Second Amendment Motion"), and the PSAC was attached as an exhibit in the same submission, Dkt. No. 62-3. Plaintiff refers to this submission as her "second" motion to amend. Dkt. No. 62. Because it is identical to her first Amendment Motion, the Court denies the Second Amendment Motion as moot.

Applying this standard to Plaintiff's Amendment Motion, the Court finds that amendment of the pleading is appropriate to the extent that the PSAC corrects typographical errors, adds minor factual details regarding the involvement of Health Alliance Hospital and Access: Support for Living, and adds other nonmaterial clarifying details. PSAC ¶¶ 12–13, 16, 33, 40–41, 48, 50, 52, 97, 109–11, 156, 174–76, 189, 196–97. To determine whether Plaintiff may amend her pleading to add factual details in support of her Monell and supervisory liability claims, the Court must determine whether the PSAC adequately alleges these claims.

### 1. *Monell Claims*

The PSAC adds numerous factual allegations in the sections outlining Plaintiff's Monell claims. Id. ¶¶ 150–54, 165–69. While many of these new allegations are irrelevant or redundant, the PSAC does clarify that Ryan and Van Blarcum ordered Mcguire, Benjamin and Rafferty "to take Plaintiff's pistol, and to take Plaintiff to a hospital for mental evaluation." Id. ¶¶ 150, 165. The Court assumes that Plaintiff intends these allegations to support her claim that Van Blarcum and Ryan's orders constituted a policy for purposes of a Monell claim. However, the PSAC, like the Amended Complaint, does not include any non-conclusory allegations supporting the claim that either Van Blarcum or Ryan are final policymakers. Accordingly, the Court finds that amendment of the pleadings to add these facts in support of Plaintiff's Monell claim is denied as futile.

### 2. *Supervisory Liability Claims*

In their Motion, Ulster Defendants argue that Plaintiff failed to state a supervisory liability claim against Van Blarcum because she included insufficient factual detail regarding his personal involvement in her false arrest or in the search of her home and the seizure of her gun.

Ulster Mem. at 5–6. The PSAC, in a section outlining Plaintiff's unreasonable search and seizure claims, alleges that Ryan and Van Blarcum ordered McGuire, Benjamin, and Rafferty "to take Plaintiff's pistol, and to take Plaintiff to a hospital for mental evaluation." PSAC ¶ 55. The Court finds that amendment of the pleadings to add this fact would enable Plaintiff to state a supervisory liability claim against Van Blarcum and Ryan. "A supervisory official may be personally involved in a section 1983 violation where such official . . . ordered that the action be taken." Dallio v. Herbert, 678 F. Supp. 2d 35, 43 (N.D.N.Y. July 28, 2009) (quoting Thompson v. New York, No. 99-CV-875, 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001)). Therefore, the Court finds that Plaintiff may amend her pleading to include PSAC ¶¶ 55–59, the paragraphs that support her supervisory liability claims against Van Blarcum and Ryan.

### 3. Defendants' Objections

Plattekill Defendants do not specifically object to Plaintiff amending her pleading to add minor factual details, to correct tyographical errors, or to add a well-pleaded supervisory liability claim. Instead, they broadly argue that amendment would be futile because the PSAC "still do[es] not sufficiently allege 'state action' by [Plattekill] Defendants that would subject them to liability under § 1983." Plattekill Reply at 7. As stated above, the Court concludes that Plattekill Defendants' "state action" objections to the Amended Complaint are meritless. The Court rejects Plattekill Defendants' futility argument for the same reason.

Ulster Defendants argue that Plaintiff should be denied leave to amend because she lacks a good faith basis to allege Van Blarcum's "'hands on' involvement in" the deprivation of her constitutional rights. Ulster Reply at 4–5. They argue that "Plaintiff has unashamedly made allegations designed to avoid dismissal of the claims against Van Blarcum and Ulster County for

which there is no support from any plausible factual allegations," and criticize Plaintiff for not offering "affidavit[s] or documents[] to support the new allegations." Id. at 4.

As stated above, the Court may, as Ulster Defendants argue, deny a party leave to amend when that party seeks leave to amend in bad faith. Rusyniak, 629 F. Supp. 2d at 212. It may be that Plaintiff's counsel only thought to add allegations regarding Van Blarcum and Ryan's personal involvement because Ulster Defendants observed, in their Motion, that Plaintiff's supervisory liability claims were defective without such allegations. Ulster Mem. at 5–6. Moreover, the fact that it has taken Plaintiff's counsel three attempts to allege a supervisory liability claim that includes a single fact regarding the personal involvement of either supervisory defendant suggests a lack of diligence on counsel's part. However, the Court cannot accept the argument that Plaintiff or her counsel acted in bad faith simply by seeking leave to amend to correct deficiencies identified in Ulster Defendants' Motion. Furthermore, the Court certainly will not infer bad faith based on Plaintiff's failure to provide supporting affidavits or other evidence. At the motion to dismiss stage, Plaintiff need only provide "a short and plain statement of the claim showing that . . . [she] is entitled to relief," Fed. R. Civ. P. 8(a)(1), not evidence establishing the truth of her allegations.

Because Plattekill and Ulster Defendants' objections are unavailing, the Court grants Plaintiff's Amendment Motion to the extent described in this Memorandum-Decision and Order. The Court instructs Plaintiff to file a clean (non-redlined) copy of the PSAC within seven days, which will be deemed the operative pleading in this action, and which will supersede the Amended Complaint in its entirety. However, because amendment to include paragraphs

bolstering Plaintiff's <u>Monell</u> claims would be futile, the Court instructs Plaintiff to omit PSAC ¶¶ 150–54 and 165–69 from the copy that she files.

Finally, in their Motions, Ulster and Plattekill Defendants each requested that the Court dismiss Plaintiff's supervisory liability claims as alleged in her Amended Complaint. Ulster Mem. at 5–6; Plattekill Mem. at 14–15. Because the PSAC supersedes the Amended Complaint, the Court rejects Ulster and Plattekill Defendants' supervisory liability arguments as moot.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Ulster Defendants' Motion (Dkt. No. 50) and Plattekill Defendants' Motion (Dkt. No. 60) are **GRANTED in part** and **DENIED in part** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the following claims are **DISMISSED with prejudice**: Plaintiff's <u>Monell</u> claims against Ulster County and Plattekill, and her claims against Paul Van Blarcum and Joseph Ryan in their official capacities; and it is further

**ORDERED**, that the remainder of Plaintiff's claims survive dismissal; and it is further

**ORDERED**, that Plaintiff's Amendment Motion (Dkt. No. 56-2 at 12–13) is **GRANTED in part** and **DENIED in part** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Plaintiff's Second Amendment Motion (Dkt. No. 62-2 at 16–17) is **DENIED** as moot; and it is further

**ORDERED**, that Plaintiff is directed to file, **within seven days** of the filing of this Memorandum-Decision and Order, a non-redlined copy of the Proposed Second Amended

Complaint (Dkt. No. 56-3) that is modified according to the Court's instructions outlined in this opinion. This pleading shall be deemed the operative pleading in this action, and shall supersede the Amended Complaint (Dkt. No. 42) in its entirety; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties pursuant to the Local Rules.

**IT IS SO ORDERED.**

DATED:       March 22, 2018
             Albany, New York


Lawrence E. Kahn
U.S. District Judge