UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

EUGENIA COPPOLA,

                              Plaintiff,

        -against-                                    No. 1:17-CV-1032 (LEK/ATB)

HEALTH ALLIANCE HOSPITAL
BROADWAY CAMPUS, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Eugenia M. Coppola alleges that on November 19, 2016, law enforcement

officers unlawfully searched her and her home, arrested her, and brought her to Health Alliance

Hospital Broadway Campus ("Health Alliance Broadway") in Kingston, New York, where

doctors tested her blood and urine and detained her overnight. Dkt. No. 71 ("Second Amended

Complaint"). ¶¶ 34–50. She asserts claims under the Fourth and Fourteenth Amendment to the

Constitution, pursuant to 42 U.S.C. § 1983, against John McGuire, John Rafferty, Brian

Benjamin, and Joseph Ryan (the "State Defendants")—the Plattekill and Ulster County police

officers allegedly involved in Plaintiff's arrest—as well as Health Alliance Broadway, David

Scarpino, Joseph Marsicovete, Paul Llobet, and Daniel Miller, D.O. (the "Hospital Defendants").

Id. ¶¶ 51–194. She is also suing Access: Support for Living, Inc. ("Access"), its Chief Executive

Officer Amy Anderson-Winchell, and two of its employees, Matthew and Colleen Maher, who

allegedly accompanied and aided the officers who arrested her. Id. ¶¶ 33, 36, 92–94.

The Hospital Defendants have moved for judgment on the pleadings or, in the alternative, for summary judgment. Dkt. Nos. 81, 82 ("Hospital Defendants' Motions").[1] Plaintiff cross-moves for summary judgment against the Hospital Defendants. Dkt. Nos. 85, 86 ("Plaintiff's Cross-Motions"). For the reasons that follow, the Court finds that, viewing the evidence in a light most favorable to Plaintiff, the Hospital Defendants did not engage in state action. Therefore, their Motions for summary judgment are granted, and Plaintiff's Cross-Motions are denied.

## II.     BACKGROUND

### A.  Factual Backgound

Based on the evidence submitted, drawing all reasonable inferences in Plaintiff's favor, see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (explaining that in deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party" and "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses"), a reasonable jury could find as follows.

Plaintiff is a fifty-five-year-old woman who lives in Highland, New York. Dkt. No. 82-5 ("Coppola Deposition") at 7.[2] Her property contains a 200-year-old stone wall that stands up to seven feet tall. Id. at 32–33. In March and April, 2016, Plaintiff noticed that the wall was

---

[1] Dr. Miller joins the rest of the Hospital Defendants in Dkt. No. 81, and brings his own, additional summary judgment motion under Dkt. No. 82.

[2] Dkt No. 82-5, which is Exhibit C to Dr. Miller's Motion, is the transcript of Plaintiff's testimony during her examination by the Town of Plattekill and the Ulster County Sheriff's Department pursuant to N.Y. Gen. Mun. L. § 50-h.

damaged and reported it to the Plattekill police. Id. at 76. On at least two occasions in mid-to-late October, 2016, she saw men with flashlights come on to her property. Id. at 84. Her neighbors' dogs "barked aggressively" as the trespassers approached from trails in the woods bordering the sides of her land. Id. at 83–85. Plaintiff called the Ulster County Sheriff's Department and Plattekill Police Department, each of which sent an officer to Plaintiff's home on October 26 and 28, respectively, to speak with Plaintiff in person. Id. at 39, 65–69, 77–78; see also Dkt. No. 82-4 ("Sheriff's Department Report") at 5. Neither officer seems to have investigated Plaintiff's property. Id. Dissatisfied with their efforts, on October 28, 2017, Plaintiff called the New York State Troopers. Coppola Dep. at 39–40. The troopers, however, would not take the case from the Plattekill police and recommended that if the trespassers came again, Plaintiff should call 9-1-1 and "see what happens." Id. at 41.

Later on October 28, 2016, at around 7 or 8 p.m., Plaintiff again saw the men with flashlights, this time "pulling out stones" from the wall. Id. at 79–81, 95. She called 9-1-1. Id. at 90. A Plattekill Police officer, a state trooper, and Sheriff's Deputy Donald Corso arrived, but the trespassers fled and hid before they were seen. Id. at 94; see also Sheriff's Dep't Report at 15. Plaintiff told Corso "what they [were] doing to [her] walls," but Corso became "aggressive towards [her]," "shouting" and demanding to know "where . . . [Plaintiff's] walls [were] going down." Coppola Dep. at 91, 97. He said the walls "look[ed] fine to [him]," "there [was] nothing wrong," and that it was "all in [Plaintiff's] head." Id. at 92, 98, 101. Corso continued, "I don't think you are a threat to yourself so I'm not going to take you this time," but he insisted that Plaintiff take the telephone number for Ulster County's Mobile Mental Health team. Id. at 98–99, 104. He left around 9:15 p.m. Id.

On November 1, 2018, Plaintiff spoke to Chief Ryan of the Pattekill Police Department about her "walls being ripped down nightly" and "about what happened on the 9-1-1 call." Id. at 35. Chief Ryan came to Plaintiff's house, "walked the property with [her]," and "took pictures." Id. at 36. He said he would contact the Sheriff's Department to get "trail cameras" to surveille her property, and told Plaintiff to keep him updated. Id. at 36–37. On November 16, 2016, after Plaintiff reported to Chief Ryan that men were "ripping down [her] walls" again, he sent more officers to Plaintiff's home to investigate. Id. at 30–31. However, on November 17, 2016, Chief Ryan told Plaintiff that the Plattekill police were closing her case. Id. at 42, 78.

On November 19, 2016 at approximately 7:45 a.m., Plaintiff called the Ulster County Sheriff's Department to "open a new case" so that she could give the deputies photographic evidence she said she had taken. Id. at 109–10. Deputy Corso called her back later that day, around 3:00 p.m. Id. When she heard it was Corso who was calling, Plaintiff asked if he was "going to harass [her] like [he] did the last time." Id. at 109. After a brief conversation, she hung up, then called again. Id. at 110-11. The dispatcher answered and was later joined on the line by a Lieutenant Budd. Id. at 111–12. Plaintiff requested that they send deputies to her property. Id. at 112–13. The dispatcher said that a deputy would come at around 5:00 p.m. that afternoon. Id.

That evening, Sheriff's Deputy McGuire met Plaintiff in her driveway in his patrol car, but seemed "[un]interested" in Plaintiff's complaints about the trespassers and focused instead on the computer in his car. Id. at 115, 122. He refused to come with Plaintiff to observe the wall and would not take her report. Id. at 117. Shortly thereafter, Plattekill police officers John Rafferty and Brian Benjamin arrived with two mental health professionals from the mobile mental health team (allegedly Matthew and Colleen Maher, Second Am. Compl. ¶ 33). Coppola

4

Dep. at 43, 117. McGuire told Plaintiff that he wanted her to talk to the mental health workers.
Id. at 124. Frustrated, Plaintiff told the officers to "get off [her] property," and walked back to the
patio outside her house to call a friend. Id. at 116, 124–25.

The officers followed her. Id. at 126. Approaching the patio, they told her she was
"coming with [them]." Id. at 126. Plaintiff told the officers to leave, "walked in[to] her house"
and "began to shut [her] door," but McGuire extended his hand to block the door and "pushed his
way" inside. Id. at 128. Plaintiff fled up her stairs. Id. at 129. McGuire chased and grabbed her
arm, "twisting [her] back." Then, he pulled her back down the stairs and handcuffed her. Id.
While searching Plaintiff after her arrest, McGuire "pick[ed] up [her] shirt," "expos[ed] [her]
breasts," and "pull[ed] down [her] pants." Id. at 130. Finally, the officers put her in a patrol car.
Id.

Plaintiff was licensed to carry a gun and owned a Smith and Wesson .38 Special revolver,
which she kept in a lockbox in her upstairs bedroom. Id. at 133–35. The Plattekill Police had
previously informed McGuire of Plaintiff's permit for the pistol. Sheriff's Dep't Report at 5.
While Plaintiff was handcuffed in the patrol car, McGuire and Rafferty asked her where her
firearm was, and Plaintiff told them. Coppola Dep. at 137–40. The officers entered Plaintiff's
house, retrieved the gun (which contained three live rounds and one spent round of ammunition),
and put it in the trunk of the patrol car. Id. at 141; see also Sheriff's Dep't Report at 7. McGuire
later wrote in his report that

> Eugenia Coppola advised me the weapon was locked in her up [sic] and that's all we
> needed to know. Due to the circumstances of Eugenia Coppola's mental well-being,
> this Deputy and Officer Rafferty located a loaded .38 caliber Smith and Wesson

revolver in the top drawer of her dresser. Ulster County Mobile Mental Health was on the scene and advised me that I did in fact have enough to MHL941[3] Eugenia Coppola.

Id. at 5.

About fifteen to twenty minutes after Plaintiff was locked in the patrol car, an officer (either Rafferty or McGuire) let Plaintiff out, took her handcuffs off, and led her to an ambulance. Id. at 144. He told her the ambulance was going to "bring [her] to the Kingston ER for evaluation." Id. The ambulance took Plaintiff to Health Alliance Broadway, and McGuire followed. Id. at 151. Once there, he told Plaintiff that he "need[ed] [her] to sign" a document stating "that [she] came willingly." Id. at 152. Plaintiff refused, replying that she had been brought against her will. Id.

McGuire thereafter signed and submitted to hospital staff a "police agency request for mental health evaluation of a person alleged to have an emotional disturbance" under section 9.41 of the New York Mental Hygiene Law ("MHL"). Sheriff's Dep't Report at 6. He wrote that Plaintiff "th[ought] people [were] watching her and when she leaves they [were] stealing her rock walls," but that "there [was] no evidence of this," and that she "also [had] a firearm with 3 live rounds and 1 spent round." Id. He conveyed that information and his evaluation request to hospital staff and Dr. Miller, the attending

_____

[3] Section 9.41 of the New York Mental Hygiene Law authorizes police officers to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others" and "direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 or any comprehensive psychiatric emergency program specified in subdivision (a) of section 9.40, or, pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place." See also Coppola v. Town of Plattekill, No. 17-CV-1032, 2018 WL 1441306, at *3 (N.D.N.Y. Mar. 22, 2018) (addressing the implications of MHL § 9.41 for the claims against State Defendants).

emergency room physician. Dkt. No. 82-10 ("Miller Affidavit") ¶¶ 7–9. In addition, McGuire told Dr. Miller that he had found "drug paraphernalia" with the gun, id. ¶ 9, and told Jennifer Grinvalsky, a licensed master of social work at the hospital, that he thought Plaintiff was "delusional, paranoid, and intoxicated, and admitted to having a gun and shooting it off"—remarks that Grinvalsky relayed to Dr. Miller, id. ¶ 15. A "Matt" from "[t]he Mobile Mental Health team also advised that [Plaintiff] was harassing multiple police departments and that the police were concerned because every time they come to the home, [Plaintiff was] intoxicated." Id. ¶ 16; see also Dkt. No. 82-9 ("Hospital Records") at 55, 72–73.[4]

Dr. Miller examined Plaintiff, who recounted how "someone was gradually stealing rocks from her wall," that she had called the police about it, and "that she was target shooting earlier that day" (November 19, 2017). Miller Aff. ¶ 10. He then ordered hospital staff to take blood and urine samples from Plaintiff, per standard practice—though later lab tests on those samples did not reveal any alcohol or drugs in her system. Id. ¶ 13. Dr. Miller testified that he "[w]as not directed to obtain blood and urine samples by law enforcement" and the "tests were performed based on [his] medical judgment because those tests are routine tests that the standard of care requires to be performed in conducting such an evaluation." Id. ¶ 13.

Dr. Miller also authorized Grinvalsky to interview Plaintiff for a psychiatric evaluation. Id. ¶ 14; accord Coppola Dep. at 154. Plaintiff told Grinvalsky that "people

---

[4] The cited page numbers for this document refer to those generated by the Court's electronic filing system ("ECF").

[were] coming on [her] property," that it "happen[ed] every night" but that "nobody [was] taking [her] seriously," and recounted the incident at her home earlier that evening. Coppola Dep. at 156. Grinvalsky then called Plaintiff's mother, who said that she was "concern[ed] about [Plaintiff's] mental health" and believed Plaintiff was "depressed" because her son had recently moved in with his father, whom Plaintiff divorced in 2009. Id. at 162–63; see also Hosp. Rs. at 73 (summarizing conversation with Plaintiff's mother and "Matt" from the "mobile mental health team"). She was also concerned that preoccupation with the trespassers was "consuming" Plaintiff. Coppola Dep. at 161. Therefore, she asked the hospital "to have [Plaintiff] stay overnight." Id.; see also Hosp. Rs. at 73.

Grinvalsky concluded that Plaintiff "had paranoid ideations and delusions," though she did not report suicidal or homicidal ideations. Miller Aff. ¶ 16. Another physician, Dr. Matthew Stupple, also examined Plaintiff. Hosp. Rs. at 92. He and Dr. Miller agreed with Grinvalsky, and further opined that Plaintiff "did not appear to be able to care for herself and posed a danger to herself." Miller Aff. ¶ 17.

On those grounds, Dr. Miller or Grinvalsky completed an "Application for Involuntary Admission" under MHL § 9.27,[5] Health Rs. at 86, and Miller and Stupple each completed a "Certificate of Examining Physician to support an application for involuntary admission." Hospital Rs. at 92–93. Plaintiff objected. Miller Aff. ¶ 18. As a result, Grinvalsky contacted a third doctor, John Mitchell, the consulting psychiatrist on call that

---

[5] In his Statement of Material Facts, Dr. Miller states that he completed the application, Dkt. No. 82-1 ("Miller SOF") ¶ 19, but the signature on the application does not appear to be his. Compare Hos. Rs. at 86 with id. at 88, 89. The applicant indicated he or she was a "LMSW," a social worker, indicating that he or she may have been Grinvalsky.

night, "who recommended putting [Plaintiff's] involuntary admission on hold until additional . . . information was obtained about [her]" and arranged for "Plaintiff [to] be re-evaluated the following morning." Id. ¶ 18. Dr. Mitchell "ordered" that the Plaintiff "be hel[d]" in the psychiatric department until the next morning. Hosp. Rs. at 63, 72.

Dr. Miller later wrote in his affidavit that Plaintiff "was agreeable" to staying in the hospital overnight. Miller Aff. ¶ 24. However, Grinvalsky wrote that the staff did not request, but instead "informed" Plaintiff that she would remain in the psychiatric unit to "await[] further collateral information." Hosp. Rs. at 46. She also wrote that Plaintiff "was not in agreement with the disposition to admit her involuntarily." Id. at 72. Plaintiff also testified that she did not consent to any treatment or to being held overnight. Coppola Dep. at 158. Therefore, a reasonable jury could conclude that the hospital detained her without her consent.

The hospital held Plaintiff for approximately 12 hours. Id. at 166. The next morning, per Dr. Mitchell's recommendation, another social worker, Molly Tweedy, spoke to Plaintiff's friend, Danielle Kreba, who told her that Plaintiff took care of her son and was "trustworthy," although she was "going through a rough time with her son and a custody issue." Id. ¶ 20; Hosp. Rs. at 72. Kreba also corroborated that Plaintiff's "wall [was] disappearing," that "someone [was] taking the boulders," and that "other people have noticed it." Id. Tweedy then "spoke with Dr. Mitchell and Dr. D'Souza, who agreed that [Plaintiff] could be discharged with a potential referral for outpatient mental health treatment." Id. Plaintiff was released around 7:00 a.m. Coppola Dep. at 166.

### B.  Procedural Background

Plaintiff commenced this case on September 3, 2017. Dkt. No. 1 ("Complaint"). The State Defendants moved to dismiss most of the claims against them. Dkt. Nos. 50, 60 ("Motions to Dismiss"). The Court, however, found it plausible that McGuire, Benjamin, and Rafferty lacked probable cause to arrest Plaintiff under MHL § 9.41 or to search her house, and that they were not immune from suit. Dkt. No. 68 ("March Order") at 6–21, 2018 WL 1441306, at *3–9 (N.D.N.Y. Mar. 22, 2018). Nevertheless, the Court dismissed Plaintiff's claims against Ulster County Sheriff Paul Van Blarcum, Plattekill Police Chief Joseph Ryan, Ulster County, and the Town of Plattekill, though it gave Plaintiff an opportunity to amend the complaint to state claims against Van Blarcum and Ryan. Mar. Order at 26–29, 2018 WL 1441306, at *11–13. Plaintiff accepted that opportunity and filed the Second Amended Complaint on March 24, 2018. Second Am. Compl.

All Defendants answered the Second Amended Complaint. Dkt. Nos. 73–75, 77, 79. On April 30, 2018, the Hospital Defendants filed their Motions for Summary Judgment, and Plaintiff filed her Cross-Motions.[6]

## III. LEGAL STANDARDS

### A. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the

---

[6] Although discovery has not formally closed, the parties have conducted paper discovery concerning these pending motions, see Docket, Dec. 18, 2017 and Feb. 26, 2018 Text Minute Entries, and neither has "show[n] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The Court has therefore determined that the present motions are ripe for summary judgment review.

outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court may ignore factual disputes that are "irrelevant" or "unnecessary." Id. "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "In making that determination, the court is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

That said, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. To demonstrate the presence of absence of genuine issues of material fact, the parties must cite "particular parts of materials in the record, including depositions, documents" or "affidavits," which "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c).

**B. State Action**

Section 1983 gives individuals a right to sue "any person" who (1) deprives him or her of "rights, privileges, or immunities secured by the Constitution and laws" of the United States, (2) while acting "under color of" state law. Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010). "In § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the

11

challenged conduct constitutes state action." Fabrikant v. French, 691 F.3d 193, 206

(2d Cir. 2012).

"Conduct that is formally 'private' may become so entwined with governmental policies

or so impregnated with a governmental character that it can be regarded as governmental action."

Rendell-Baker, 457 U.S. at 837. However, "state action requires both [1] an alleged

constitutional deprivation 'caused by the exercise of some right or privilege created by the State

or by a rule of conduct imposed by the State or by a person for whom the State is responsible,'

and [2] that 'the party charged with the deprivation must be a person who may fairly be said to be

a state actor.'" Fabrikant, 691 F.3d at 206 (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S.

40, 50 (1999)). The fact that the government licenses, regulates, or even funds a private entity

does not make it a state actor. Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 112 (2d Cir.

2003). Rather, "there must be such a close nexus between the state and the challenged action"

that the state is "*responsible* for the specific conduct of which the plaintiff complains." Fabrikant,

691 F.3d at 207–08; see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S.

288, 295 (2001) (stating that "state action may be found if, though only if, there is such a 'close

nexus between the state and the challenged action' that seemingly private behavior 'may be fairly

treated as that of the state itself'") (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 349

(1974)).

"A state normally can be held responsible for a private decision only when it has

exercised coercive power or has provided such significant encouragement, either overt or covert,

that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991,

1004 (1982) (holding that the state was not "responsible" for nursing homes' decisions to transfer

patients to reduced-care facilities because "[t]hose [transfer] decisions ultimately turn[ed] on medical judgments made by private parties according to professional standards that [were] not established by the state"). In such circumstances, the government is a joint participant" in the private conduct and gives it the "imprint of state power." Id. at 1013 n.2; see also Fabrikant, 691 F.3d at 207 (stating that an entity commits state action when it "is a willful participant in joint activity with the state").

Private actors can also be subject to § 1983 liability when they perform a "public function"—one that "has been traditionally the exclusive prerogative of the state," but which the state has delegated to the private entity, id. at 207–09; the state may not "delegate[] its responsibilities to private parties and then attempt[] to escape liability for constitutional violations caused by [those] private parties acting pursuant to the delegation," Doe v. Rosenberg, 996 F. Supp. 343, 353 (S.D.N.Y. 1998), aff'd, 166 F.3d 507 (2d Cir. 1999).

### C. The New York Mental Hygiene Law

As authority for keeping Plaintiff in the psychiatric unit overnight on November 19, 2016, Hospital Defendants rely on her consent, Dkt. No. 81-7 ("Hospital Defendants' Statement of Facts") ¶ 83—which the Court must assume was not given, see Coppola Dep. at 158; Hosp. Rs. at 46, 72—and MHL § 9.27, id. ¶¶ 75–76. MHL § 9.27 provides that "[t]he director of a hospital *may* receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person" by one of several listed individuals. MHL § 9.27(a)–(b) (emphasis added). The law defines "in need of involuntary care and treatment" to "mean[] that a person has a mental illness for which care and treatment as a patient in a hospital

13

is essential to such person's welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment." Id. § 9.01.

In Doe v. Rosenberg, the United States District Court for the Southern District of New York held that an emergency room physician did not act for the state when he ordered the plaintiff involuntarily hospitalized under MHL § 9.27. 996 F. Supp. at 348–49. First, the court reasoned that the statute, providing that a hospital "may" involuntarily commit mentally ill patients, "leaves the decision to commit completely to the physician's discretion" and therefore does not compel or encourage commitment. Id. Rather, the statute defers to the doctor's judgment, "guided by generally accepted standards in the medical community," as to whether a person "pos[es] a substantial threat of harm to his or her person or others" and therefore requires involuntary treatment. Id. at 351. Second, "because the MHL merely licenses private physicians and hospitals to [impose] involuntary commitments yet in no way influences the decision to commit, its relationship with the Hospital Defendants [was] insufficient to pass the close nexus/joint action test." Id. at 353.

Finally, the court found that "the powers exercised by the Hospital Defendants are not the sort that were 'traditionally the exclusive prerogative of the State.'" Id. at 353 (quoting Jackson, 419 U.S. at 352). It accepted other district courts' conclusions that New York, through its Constitution and the MHL, had "assum[ed] . . . responsibility for the prevention and early detection of mental illness and for the comprehensively planned care, treatment and rehabilitation of [its] mentally ill citizens," id. at 353–5 & n.6 (citing Rubenstein v. Benedictine Hosp., 790 F.Supp. 396 (N.D.N.Y. 1992) and Ruffler v. Phelps Memorial Hosp., 453 F.Supp. 1062 (S.D.N.Y. 1978)), and that public institutions could traditionally confine the mentally ill against

their will for treatment, id. at 356. However, the court also found that, historically, private institutions shared the state's prerogative to confine and treat the mentally ill, meaning that the MHL did not give hospitals "powers . . . traditionally exclusively reserved to the State." Id. at 353. The Second Circuit affirmed the judgment for "substantially the reasons set forth in the district court's comprehensive and scholarly opinion." Rosenberg, 166 F.3d at 507.

Years later, however, the Second Circuit decided Fabrikant. 691 F.3d at 208. There, the plaintiff, another Ulster County resident, argued that the Ulster County Society for the Prevention of Cruelty to Animals ("SPCA") unlawfully spayed and neutered her dogs after seizing them during an animal abuse investigation. Id. at 207. The Court concluded that the power to seize and treat animals was traditionally reserved for New York but had been delegated to the SPCA, reasoning that "[j]ust as only the state may legitimately imprison individuals as punishment for the commission of crimes . . . only the state (or agents to whom it delegates its police power) may seize animals and operate on them against their owner's wishes." Id. at 210. Indeed, the court observed, "[w]ere it not for that delegation of authority, the SPCA's sterilization of these dogs without [the plaintiff]'s consent would have been tortious or even criminal; private individuals or associations acting on their own authority would have no right to interfere with animals that were the property of another person." Id. at 208.

Fabrikant arguably sits in tension with Rosenberg. In light of Fabrikant, to reaffirm Rosenberg was to hold that the Constitution's protections are implicated when a private dog catcher seizes a pet, Fabrikant, 691 F.3d at 208, but not when a private hospital detains its owner, Rosenberg, 166 F.3d at 507. In any event, there is reason to question Rosenberg's conclusion that the MHL merely codified a prerogative that private actors traditionally shared with the state

under common law. Rosenberg failed to recognize the comparatively limited extent to which New York common law traditionally privileged private entities to confine the mentally ill. 996 F. Supp. at 356.[7] Although New York

> common law recognized the power to restrain, summarily and without court process, an insane person who was dangerous at the moment . . . [t]he power was to be exercised . . . only when necessary to prevent the party from doing some *immediate injury* either to himself or others, and only *when the urgency of the case demand[ed] immediate intervention*. On the other hand, insane persons who were not dangerous were not liable to be thus arrested or restrained. And upon one who did the restraining rested the burden of showing, in order to justify it, the urgency and necessity for the immediate restraint.

Warner v. State, 79 N.E.2d 459, 462 (N.Y. 1948) (emphasis in original). In Warner, the New York Court of Appeals held that where the common law privilege reached "only" situations "where immediate and precipitate action [was] demanded to prevent present and imminent harm," the MHL authorized private entities to act in "lesser emergencies . . . where something less than present and imminent danger threatens." Id. at 463.

MHL § 9.27, in particular, gives physicians the authority to confine patients in broader, non-emergency circumstances beyond those covered by the common-law privilege. As indicated earlier, it authorizes private doctors to confine a mentally ill person whenever his or her "care and treatment as a patient in a hospital is essential to [their] welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment." MHL § 9.01. As in Fabrikant, "[w]ere it not for that delegation of authority," a hospital's detention of a mentally

---

[7] The court in Rosenberg did cite to 1874 N.Y. Laws ch. 446, § 1, an 1874 law that "authoriz[ed] any asylum, public or private, institution, home, or retreat that cared for the mentally ill, without court order, to commit for five days any person upon the certificates of two physicians." But it is not clear whether any legal norm authorized private hospitals to confine mentally ill persons who did not present immediate dangers before the passage of the Fourteenth Amendment in 1868.

ill person in non-emergent circumstances "without [his or her] consent would have been tortious or even criminal; private individuals or associations acting on their own authority would have no right to interfere" with that person's liberty. 691 F.3d at 208. Thus, it may be that Rosenberg was incorrect in finding that the power to involuntarily detain the mentally ill was not "traditionally the exclusive prerogative of the state," 966 F. Supp. at 353 (quoting Jackson, 419 U.S. at 352), and that MHL § 9.27 does give doctors a prerogative that was traditionally the state's to delegate.

Nevertheless, in 2014 and 2017, the Second Circuit held that Rosenberg is still binding, and that "a hospital does not, by virtue of confining patients pursuant to the MHL, satisfy any of the . . . tests for 'state action' under § 1983," including the "public function" test. Amid v. Chase, 720 F. App'x 6, 11 (2d Cir. 2017) (citing McGugan v. Aldana-Bernier, 752 F.3d 224, 229–30 (2d Cir. 2014)). The court in McGugan questioned whether Rosenberg was correctly decided, suggesting it was indeed possible that "the power to involuntarily hospitalize a patient" was in fact "traditionally . . . within the exclusive prerogative of the state." McGugan, 752 F.3d at 231. However, it concluded "[a]rguments that Rosenberg was wrongly decided should either be made in a petition to [the Second] Circuit for en banc review, or to the Supreme Court." Id. at 230. Thus, the Court is bound by Rosenberg's holding that the typical MHL confinement—based solely on private doctors' independent judgments—does not have constitutional protection. McGugan, 752 F.3d at 230; Amid, 720 F. App'x at 11.

Since the MHL regime does not turn involuntary commitments by private hospitals into state action, a private hospital or doctor who involuntary commits a patient can only be liable under § 1983 if, in a particular case, state officers provide "significant encouragement to the entity" to take the challenged action, or the "entity is [otherwise] a wilful participant in joint

17

activity with the state." <u>Fabrikant</u>, 691 F.3d at 207. Turning to the particular circumstances of the cases, the courts in both <u>McGugan</u> and <u>Amid</u> found that even though police officers arrested the plaintiffs and brought them to the hospital, the officers were not responsible for her involuntary commitment because they did not "request[], much less compel" hospital staff to detain her. 752 F.3d at 230; 720 F. App'x at 11. Therefore, they found no state action and affirmed the dismissals of the claims against the hospitals and doctors. <u>Id.</u>

## IV.    ANALYSIS

Like the hospitals in <u>Rosenberg</u>, <u>McGugan</u>, and <u>Amid</u>, Health Alliance Broadway is a private entity, and its employees and Dr. Miller are private individuals. Dkt. No. 82-7 ("Llobet Affidavit") ¶ 10; Miller Aff. ¶ 8. However, Plaintiff argues that Dr. Miller and his colleagues' decisions to test Plaintiff's blood and urine and commit her were nonetheless state action because, unlike in <u>Rosenberg</u>, <u>McGugan</u>, or <u>Amid</u>, the state officers unduly influenced them by (1) "requesting an evaluation of [Plaintiff] pursuant to § 9.41 of the [MHL]," and (2) falsely telling hospital staff that Plaintiff had been "harassing" police departments," was delusional and drunk, that drug paraphernalia was found on her property, and that there was "no evidence for" her claims that people were stealing her rock walls. Dkt. No. 85-5 ("Plaintiff's Memorandum") at 13 (referring to Miller Aff. ¶¶ 7, 9 and Sheriff's Dep't Report at 6).[8] She contends that these

---

[8] These are not Plaintiff's only arguments, but they are her strongest ones. Plaintiff also argues that the Hospital Defendants were joint actors with the state because (1) "the pick-up order was signed after Plaintiff had already been picked up by police and arrived at [the hospital];" (2) Plaintiff "did not authorize the hospital and the doctor to provide medical treatment;" and (3) "the content of the pick-up order did not establish that Plaintiff was a danger to herself or others under [MHL] § 9.41." Pl.'s Mem. at 13. However, these arguments address whether there was adequate justification for the state officers and/or the Hospital Defendants to detain Plaintiff; they do not provide reasonable bases to infer that any of the Hospital Defendants' decisions—however misguided or wrongful—are fairly attributable to state officers. <u>Fabrikant</u>, 691 F.3d at 207–08. Plaintiff also writes that "the authorizations to transport and

18

statements tainted Dr. Miller's professional judgment that she should be tested and held overnight and made the state responsible for that commitment decision. The Court disagrees.

Since Rosenberg, courts have sometimes held the state responsible for a private doctors' commitment decisions, but only when the officers played decisive roles in the decision. See Bryant v. Steele, 93 F. Supp. 3d 80, 87 (E.D.N.Y. 2015) (reasoning that the applicable statute, MHL § 9.37, required an application from a state doctor as a prerequisite to involuntary commitment, and that the private defendants "relied on the assessment of . . . [the] state [doctor] without conducting an independent medical examination"); Tewksbury v. Dowling, 169 F. Supp. 2d 103, 110 (E.D.N.Y. 2001) (reasoning that private doctors "could not [legally] have involuntarily hospitalized [the plaintiff] without the certification from [the state doctor]," and that private defendants relied exclusively on information obtained from state doctors and a state social worker to make commitment decision). These cases comport with the principle that the state must be the "cause" of the plaintiff's injury. Fabrikant, 691 F.3d at 206

The Ninth Circuit's opinion in George v. Edholm, 752 F.3d 1206 (9th Cir. 2014), illustrates this point. There, the court found that the evidence—suggesting that two policemen misrepresented a plaintiff's medical condition to a doctor "with the intent of inducing" him to perform an illegal cavity search—was sufficient to show state action because it suggested that the policemen "induced . . . [the doctor] to do what he would not otherwise have done," and that the

_____

accept medical treatments [for] Plaintiff were signed by the police officers." Pl.'s Mem. at 13, evidently referring to Dkt. No. 82-8 ("Mobile Mental Health Report") at 5 (stating that "Ulster County PD signed for patient to accept treatment and transport"). While it is true that Deputy McGuire signed a form "accept[ing] treatment and transport" by the Mobile Mental Health team, id. at 6–7, and the pick-up order, Sheriff's Dep't Report at 6, there is no evidence that police signed any other "authorizations" for Health Alliance Broadway or its staff to confine or treat Plaintiff.

procedure was "unlikely to have been undertaken without state encouragement." Id. at 1215–16. In other words, the state officers "could be held responsible" for the unconstitutional procedure because there was creditable evidence that, absent their misrepresentations, the doctor would not have violated the plaintiff's rights. Id. at 1217. Conversely, as at least one other court has articulated, "[e]ven if some information from [police] was included in the physicians' probable cause finding, and that information was false, it does not constitute a Fourth Amendment violation unless the information was necessary to the finding of probable cause." Pence v. Zifcak, C.A. No. 2004-3396, 2007 WL 465199, at *9 (D. Md. Feb. 7, 2007) (citing Franks v. Delaware, 438 U.S. 154, 156 (1978)).

Common law principles, which "guide . . . the definition of § 1983 claims," Manuel v. City of Joliet, 137 S. Ct. 911, 920 (2017), also teach that not every state contribution to a private actor's decision makes the state responsible for its results. A defendant who gives "substantial assistance or encouragement" to a tortfeasor is only responsible if his or her contribution is a "substantial factor in causing the . . . tort." Restatement (Second) of Torts § 876 (1979) ("Restatement"). In other words, "[t]he assistance of or participation by the defendant may be so slight that he is not liable for the act of the other." Id. To determine the instigator's liability, "the same" factors "used in determining the existence of legal causation"—"the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind"—"are all considered." Id.

The Restatement's "substantial factor" requirement fits with the purpose behind § 1983 and the state action doctrine: to "deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights," Wyatt v. Cole, 504 U.S. 158, 161

(1992), without federalizing any private actions the government touches but cannot control, see Brentwood, 531 U.S. at 295 (describing purposes of "state action" rule as "preserv[ing] an area of individual freedom by limiting the reach of federal law," "avoid[ing] the imposition of responsibility on a State for conduct it could not control," and "assur[ing] that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains").

In this case, State Defendants requested that Plaintiff be evaluated and provided information to the doctors. Miller Aff. ¶¶ 7, 9, 15–16; Sheriff's Dep't Report at 6; Hosp. Rs. at 55, 72–73. Their contributions, however, were too slight to make it "fair" to hold them responsible for the ultimate decision. Brentwood, 531 U.S. at 295. Unlike in Bryant and Tewsksbury, it is not genuinely disputed that Dr. Miller, Dr. Stupple, and Grinvalsky independently examined, tested, and interviewed Plaintiff, interviewed her mother (who Plaintiff admits was "concerned about [her] mental health" and asked the hospital "to have [Plaintiff] stay overnight," Coppola Dep. at 161) and, with Dr. Mitchell, formed their own conclusions based on professional standards of care and their own expertise. Miller Aff. ¶ 10–18; Coppola Dep. at 156, 161–63. Dr. Miller testified that he also relied on his own medical judgment in deciding to test Plaintiff's blood and urine, and there is no evidence that state actors encouraged him to do so. Miller Aff. ¶ 13; supra n. 8. There is no evidence that Dr. Miller or his colleagues solicited or relied on state actors' advice (including the officers' lay conclusions that Plaintiff was paranoid or delusional).

In other words, the testing and commitment "decisions ultimately turn[ed] on medical judgments made by private parties according to professional standards that [were] not established

by the State." Blum, 457 U.S. at 1004; see also Tewksbury, 169 F. Supp. 2d at 109 ("[I]f the decision to commit [the plaintiff] was based purely on [the private health care provider's] own independent medical judgment, Defendants would be correct that they are not state actors."). Just as "[a] private party supplying information or seeking police assistance does not become a state actor . . . unless the police officers were improperly influenced or controlled by the private party," Rice v. City of New York, 275 F. Supp. 3d 395, 403 (E.D.N.Y. 2017), police officers who request a mental health evaluation and convey truthful information to a doctor are not thereby responsible for his or her subsequent diagnosis or commitment decision. See Williams v. City of New York, No. 16-CV-4315, 2017 WL 4158903, at *4 (S.D.N.Y. Sept. 14, 2017) (holding that "allegations that the City Defendants drove the plaintiff to the hospital and reported their interactions with the plaintiff to the hospital staff [were] insufficient to allege state action on the part of the Hospital Defendants" because "the hospital staff plainly conducted their own analyses and reached their own conclusions as to the plaintiff's mental state").

Plaintiff implies that as in George, 752 F.3d at 1215–16, the State Defendants lied when they stated that she was intoxicated and had drug paraphernalia and, therefore, subverted Dr. Miller's independent judgment. Pl.'s Mem. at 13. However, Dr. Miller provided uncontradicted testimony that the blood and urine tests were "routine tests" that must (under the applicable medical standard) be performed in conducting any such psychological evaluation and, therefore, would have been performed even if State Defendants had not suggested Plaintiff was intoxicated. Miller Aff. ¶ 13. Moreover, by the time he made his commitment decision, Dr. Miller knew, based on those laboratory tests, that she had no alcohol or drugs in her system, and therefore relied primarily on other evidence—from interviews with Plaintiff, her mother, and the mobile

mental health workers, for example—in deciding to commit her. Miller Aff. ¶ 13. Therefore, unlike in George, no reasonable jury could find that the State Defendants' alleged misrepresentation that Plaintiff was intoxicated or possessed drug paraphernalia "induced" the doctors to commit her when they "would not otherwise have done" so. George, 752 F.3d at 1216; see also Schoolcraft v. City of New York, 103 F. Supp. 3d 465, 491, 532–34 (S.D.N.Y. 2015) (holding that "[t]he fact that [plaintiff] was brought to the hospital [in] police custody," and that doctors considered misinformation from police when deciding to commit the plaintiff, did not "transform this private hospital and its staff into state actors for section 1983 purposes"); cf. Betts v. Shearman, 751 F.3d 78, 86 (2d Cir. 2014) (holding that defendant who filed false complaint did not thereby act jointly with police to effectuate plaintiff's resulting arrest).

On the other hand, a rational jury *could* find the State Defendants' representations that there was "no evidence" that people were trespassing on Plaintiff's property, Miller Aff. ¶ 9, meaningfully influenced the doctors' decision. Had Ms. Grinvalsky and the doctors known (as the Court must assume) that people were, in fact, regularly entering Plaintiff's property, they might have concluded that she was not delusional and a danger, but was instead the understandably frustrated victim of an ongoing crime being ignored by local police. Nevertheless, there is no evidence that State Defendants knew Plaintiff's claims were true and concealed that fact—only that they would have known if they had investigated more thoroughly and, therefore, may have been negligent to represent that Plaintiff's claims were baseless. However, to be responsible for a constitutional violation, state officers must "through their own actions . . . satisfy each element of the underlying constitutional tort," Turkman v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015), and "[n]egligence is not a basis of liability for constitutional torts." O'Neill v.

Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). In any event, State Defendants had no duty under the Fourth Amendment to look for evidence negating probable cause before arresting Plaintiff. See Carpenter v. City of New York, 984 F. Supp. 2d 255, 265 (S.D.N.Y. 2013) ("An arresting officer has no duty to investigate exculpatory defenses, or to assess the credibility of claims regarding exculpatory defenses."). Therefore, none of State Defendants' alleged misrepresentations to hospital staff—which were either the result of mere negligence or were immaterial to the commitment decision—can make the State Defendants responsible for violating the Fourth or Fourteenth Amendment, either directly or through the Hospital Defendants' subsequent actions.

Accordingly, no reasonable jury could find that the Hospital Defendants' decisions to test or commit Plaintiff constituted state action, and their Motions for Summary Judgment must be granted.[9]

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the Hospital Defendants' and Dr. Miller's Motions for Summary Judgment (Dkt. Nos. 81, 82) are **GRANTED**; and it is further

**ORDERED**, that Plaintiff's Cross-Motions for Summary Judgment (Dkt. Nos. 85, 86) are **DENIED**; and it is further

_____

[9] None of the foregoing, however, should be construed to suggest that the Hospital Defendants were justified in keeping Plaintiff confined overnight (if they did so), or that they complied with the MHL or the constitutional requirements that would apply if they were state actors. Moreover, the Court expresses no opinion concerning whether a reasonable jury could find the State Defendants liable under § 1983 for arresting Plaintiff or searching her house, acts which may still have been unconstitutional, Mar. Order at 6–21, 2018 WL 1441306, at *2–9. Finally, the Court does not express any opinion concerning the potential liability of Access, Anderson-Winchell, or the Mahers. Since only the Hospital Defendants moved for summary judgment, questions concerning the other Defendants are reserved for future motions for summary judgment or trial.

**ORDERED**, that the claims against the Hospital Defendants (Health Alliance Hospital Broadway Campus, David Scarpino, Joseph Marsicovete, Paul Llobet, and Daniel Miller, D.O.) are **DISMISSED** with prejudice, and the Clerk shall terminate their status as defendants; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      January 17, 2019
            Albany, New York


Lawrence E. Kahn
U.S. District Judge