UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

EUGINIA COPPOLA

                        Plaintiff,

        v.                                          1:17-CV-1032 (LEK/ATB)

PAUL VAN BLARCUM, *et al.*,

                        Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

        Plaintiff Euginia Coppola brought this action under 42 U.S.C. § 1983 against: Paul Van

Blarcum; John Maguire; John Raftery; Brian Benjamin; Joseph Ryan; Access: Supports for

Living, Inc. ("Access"); Amy Anderson-Winchell; Matthew Maher; and Colleen Maher

(collectively, "Defendants").[1] Plaintiff alleges that Defendants violated the Fourth and

Fourteenth Amendments of the United States Constitution when they confined her against her

will and searched her home on November 19, 2016. See Dkt. No. 71 ("Second Amended

Complaint" or "SAC") ¶ 1.

        The Ulster Defendants, the Town Defendants, and the Access Defendants have each

moved for summary judgment. See Dkt. Nos. 121–23. In addition to opposing those motions,

Plaintiff has cross-moved for summary judgment. See Dkt. No. 127.

        For the reasons discussed below, the Court grants each set of defendants' motion, denies

_____

        [1]  Van Blarcum and Maguire are collectively referred to as the "Ulster Defendants" in this
Memorandum-Decision and Order. Raftery, Benjamin, and Ryan are collectively referred to as the
"Town Defendants." Access, Anderson-Winchell, Matthew Maher, and Colleen Maher are
collectively referred to as the "Access Defendants".

Plaintiff's cross-motion, and dismisses this action.

## II.    BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

#### 1.  The Parties

Plaintiff Euginia Coppola is a daycare operator. See Dkt. No. 121-20 ("Ulster

Defendants' Statement of Material Facts" or "Ulster Defendants' SMF") ¶ 2; Dkt. No. 127-2

("Plaintiff's Response to Ulster Defendants' SMF") ¶ 2.

Defendant Paul Van Blarcum[2] was the sheriff of Ulster County from January 1, 2007 to

December 31, 2018. See Ulster Defendants' SMF ¶ 180; Pl.'s Response to Ulster Defendants'

SMF ¶ 180. Van Blarcum is sued only in his individual capacity. See Dkt. No. 72.

Defendant John Maguire is a deputy in the Ulster County Sheriff's Office ("UCSO").

See Dkt. No. 121-19 ("Maguire Affidavit") ¶ 2.

Defendant John Raftery[3] is an officer with the Town of Plattekill Police Department

("TPPD"). See Dkt. No. 121-13 ("Raftery Deposition") at 7.

Defendant Brian Benjamin is a TPPD officer. See Dkt. No. 121-16 ("Benjamin

---

[2]  The Second Amended Complaint refers to this defendant both as "Paul Van Blarcum," SAC ¶ 147, and as "Paul VanBlarcum," id. at ¶ 12. The Ulster Defendants refer to this defendant as "VanBuren," "VanBlarcum," and "Van Blarcum." See Dkt. No. 121-21 ("Ulster Defendants' Memorandum of Law") at 2, 7, 21. The Court has already advised Plaintiff's counsel to exercise diligence in its references to defendants. See March 2018 Order at 2 n.1. The Court will refer to this defendant as "Van Blarcum" as that is how he is referenced in the case caption. See Docket.

[3]  The Second Amended Complaint refers to this defendant as "John Rafferty". SAC ¶ 14. The Town Defendants' Motion refers to this defendant as "John Raftery". Town Defs.' Mot. at 11. The Court will refer to him as "Raftery".

Deposition") at 6.

Defendant Joseph Ryan is chief of TPPD. <u>See</u> Dkt. No. 121-17 ("Ryan Deposition") at 7.

Defendant Access: Support for Living, Inc. is "a multi-service agency . . . serving people with mental illness, chemical dependency and intellectual/developmental disabilities." <u>See</u> Dkt. No. 123-12 ("Access Defendants' SMF") ¶ 70. Pursuant to a contract with Ulster County, Access provides "mobile mental health services," meaning the performance of "clinical assessment[s] and intervention service[s] for people in crisis or extreme need." Dkt. No. 123-8 ("Anderson-Winchell Deposition") at 12–13.

Defendant Amy Anderson-Winchell is Access' President. See id. at 15.

Defendant Matthew Maher is a clinician for Mobile Mental Health ("MMH"), an agency of Access. <u>See</u> Dkt. No. 123-7 ("Matthew Maher Deposition") at 9; Dkt. No. 123-1 ("Attorney Gasparini Affidavit") ¶ 49.

Defendant Colleen Maher is an MMH clinician. <u>See</u> Dkt. No. 123-6 ("Colleen Maher Deposition") at 6.

### 2. Plaintiff's Property

Plaintiff owns 25 acres of property in Highland, New York. <u>See</u> Dkt. No. 127-3 ("Plaintiff's Affidavit") at 3. The property is surrounded by stone walls measuring approximately four-to-five feet tall and four feet wide. <u>Id.</u> Plaintiff provided daycare services from her home on the property. <u>See</u> Access Defendants' SMF ¶ 3; Dkt. No. 127-15 ("Plaintiff's Response to Access Defendants' SMF") ¶ 3. Upstairs in a portable lockbox, Plaintiff kept a revolver for which she had a valid permit. See Access Defs.' SMF ¶ 2; Pl.'s Resp. to Access

Defs.' SMF ¶ 2*; Ulster Defs.' SMF ¶ 136. Plaintiff placed a food cart at the foot of the stairs to prevent the children under her care from going upstairs and potentially accessing the firearm. See Access Defs.' SMF ¶ 4; Pl.'s Response to Access Defs.' SMF ¶ 4. The Ulster Defendants assert that Plaintiff told Maguire she used the firearm outside for target practice while the daycare children were also outside, but Plaintiff denies this fact. Compare Ulster Defs.' SMF ¶ 134 with Pl.'s Resp. to Ulster Defendants' SMF ¶ 134.

### 3. *Plaintiff's Interactions with Law Enforcement*

In 2015, Plaintiff began to suspect that unknown individuals were removing multi-ton landscaping boulders from her property, as well as rocks from the stone walls. See Access Defs.' SMF ¶ 5; Pl.'s Response to Access Defs.' SMF 5. Plaintiff believed that the individuals were stealing in order to intimidate her into leaving so that they could take her land. See Access Defs.' SMF ¶ 9; Pl.'s Response to Access Defs.' SMF ¶ 9; Dkt. No. 123-5 ("Plaintiff's Deposition") at 104.

On April 27, 2016, Plaintiff reported the alleged thefts to TPPD. See Dkt. No. 121-4 ("TPPD Records") at 7; See Ulster Defs.' SMF ¶ 4; Pl.'s Response to Ulster Defendants' SMF ¶ 4. In September 2016, Plaintiff's mother told her that she "was getting a little obsessive" about the apparently vanishing stones. Pl.'s Dep. at 107. Plaintiff contacted TPPD again on October 25, 2016. See TPPD Records at 9. On October 26, 2016, TPPD responded to Plaintiff's home, and Plaintiff showed the responding officer the areas from which she believed stones were being removed. Id. TPPD followed up with another visit to Plaintiff's property on October 28, 2016. Id. Later that day, TPPD assisted UCSO in responding to Plaintiff's complaint that four males were removing rocks from the stone walls, but no evidence was found to support

Plaintiff's assertion. Id. at 11. During this visit, a non-defendant UCSO deputy gave Plaintiff

the phone number for MMH. See Access Defs.' SMF ¶ 13; Pl.'s Response to Access Defs.'

SMF ¶ 13. On November 5, 2016, TPPD performed a welfare check on Plaintiff and found her

sitting in her backyard in the dark. See TPPD Records at 12–13. Plaintiff told TPPD "that there

were people watching her house and when she[']s not around[,] they are removing stones from

her walls that line her property." Id. at 13. TPPD told Plaintiff "that there is no sign of any

disturbed rocks on her stonewall" and noted that it would follow up with Plaintiff's mental

health case worker "due to her declining condition." Id. Then, on November 16, 2016, Ryan

called TPPD patrol regarding Plaintiff's well-being, stating that "she may want to hurt herself."

Id. at 15. TPPD patrol officers found Plaintiff sitting outside dressed in camouflage, and she

stated that she was waiting for the people she suspected were stealing her rocks. Id. TPPD noted

that Plaintiff "did not seem to be a danger [to herself] or others at this time, and there were no

children, or anyone else in the residence[.]" Id.

### 4. The November 19, 2016 Incident

On November 19, 2016, a non-defendant UCSO deputy called Plaintiff to follow up on

her ongoing complaints. See Ulster Defs.' SMF ¶ 71; Pl.'s Response to Ulster Defendants'

SMF ¶ 71. The deputy reminded Plaintiff that he had given her the contact information for

MMH because he believed the complaints were related to "a mental issue." See Ulster Defs.'

SMF ¶ 73; Pl.'s Response to Ulster Defendants' SMF ¶ 73.

UCSO then dispatched Maguire to Plaintiff's property. See Dkt. No. 122-9 ("Town

Defendants' SMF") ¶ 17; Ulster Defs.' SMF ¶ 74. Maguire, who had never been to Plaintiff's

property before, was sent there to check on a "possibl[y] delusional individual who believes

[someone] is stealing her rock wall." See Ulster Defs.' SMF ¶ 78; Dkt. No. 121-3 ("UCSO Records") at 4. Upon Maguire's arrival at approximately 5 p.m., Plaintiff told him that her "walls [were] being ripped down each night." See Town Defs.' SMF ¶ 18 (citing Pl.'s Dep. at 118); Access Defs.' SMF ¶ 19. Plaintiff showed Maguire the area where she believed the thefts were occurring. See Ulster Defs.' SMF ¶ 119. Maguire asserts that Plaintiff became agitated when she realized he did not believe her. See Dkt. No. 121-12 ("Maguire Deposition") at 30–31. According to Maguire, Plaintiff informed him that she had a gun. See Maguire Aff. ¶ 9. In Maguire's version of events, he called a supervisor, who confirmed the existence of Plaintiff's firearm permit and instructed Maguire to seize the weapon for safekeeping. See id.

TPPD officers Raftery and Benjamin then arrived on the scene, having received a call from a UCSO dispatcher to assist with its response. See Town Defs.' SMF ¶¶ 12–13, 20; Pl.'s Dep. at 118–19. Raftery and Benjamin assert that Maguire informed them that he was considering "removing Plaintiff for a mental health evaluation with the assistance of MMH." See Town Defs.' SMF ¶¶ 27–28. According to Colleen Maher, a UCSO deputy called Access and requested its help with the unfolding situation. See Colleen Maher Depo. at 14.

Mental Hygiene Law ("MHL") § 9.41 states in relevant part that "[a]ny . . . police officer . . . may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." MHL § 9.41. That statute also permits law enforcement to "remove" such an individual to a hospital. Id. Another MHL provision, § 9.45, gives this same "removal" authority to directors of community services upon a report from "a licensed psychologist," a "certified social worker currently responsible for providing treatment services to the person," or a police officer, among

6

others. MHL § 9.45.

A UCSO deputy contacted Access to request assistance with a female subject who had repeatedly reported thefts from her property. <u>See</u> Access Defendants' SMF ¶ 34. After Matthew and Colleen Maher arrived at approximately 5:30 p.m., Maguire told Plaintiff that the Mahers were mental health workers who wanted to talk to her. <u>See</u> Access Defs.' SMF ¶¶ 20, 53. In response, Plaintiff because "extremely upset" and screamed at Maguire. <u>See</u> Ulster Defs.' SMF ¶¶ 140, 143. Plaintiff then demanded that everyone—Maguire, Raftery, Benjamin, and Matthew and Colleen Maher—leave her property because they were not taking her theft report seriously. See id. ¶ 144. According to Maguire, Plaintiff refused to tell him where she stored her firearm. See Maguire Aff. ¶ 13. Though Plaintiff disputes that she ever spoke to the Matthew and Colleen Maher, see Pl.'s Response to Ulster Defs.' SMF ¶ 184, Colleen Maher formed the opinion that Plaintiff was "paranoid and delusional," <u>see</u> Dkt. No. 121-15 at 41. At some point, Maguire heard Matthew Maher yell that he would sign an order under either MHL § 9.41 or § 9.45—Maguire is not sure which. <u>See</u> Maguire Dep. at 90. Maguire explicitly asked Matthew Maher whether the MHL allowed him to take Plaintiff to the hospital under the circumstances, and Matthew Maher responded that it did. <u>See</u> Maguire Aff. ¶ 13. Maguire stated in a sworn statement that he relied on MMH's assessment that there were sufficient grounds to take Plaintiff to the hospital and that, without MMH's presence, he is unsure that he would have done so. Maguire Aff. ¶ 13.

Maguire informed Plaintiff that he was taking her to the hospital. Plaintiff then pushed past Maguire, ran into her house, and tried to slam the door shut. See Ulster Defs.' SMF ¶ 176. Maguire used his foot to prevent the door from closing and forced his way into the home.

See id. ¶ 177. He grabbed Plaintiff's arm as she started up the stairs and brought her to the front

door where Raftery and Benjamin stood. See id. ¶ 178. Maguire handcuffed Plaintiff and patted

her down before putting her into his patrol car. See id. ¶¶ 198, 206. Raftery and Maguire then

entered Plaintiff's home, went to her bedroom, and retrieved her firearm from a dresser drawer.

See Maguire Aff. ¶ 19. Maguire stated that he "didn't know" whether a warrant was required in

order to lawfully retrieve the weapon and made a "split decision" to retrieve it without one.

See Maguire Dep. at 47, 57. Plaintiff was eventually freed from the handcuffs and transferred to

an ambulance, which transported her to the hospital. See Ulster Defs.' SMF ¶ 198.

### B. Procedural History

Plaintiff initiated this lawsuit on September 3, 2017. Docket. On November 6, 2017,

Plaintiff filed an amended complaint. See Dkt. No. 42 (the "Amended Complaint"). On March

22, 2018, the Court granted Plaintiff's motion to amend in part and denied it in part. See Dkt.

No. 68 (the "March 2018 Order"). Plaintiff filed another amended complaint on March 24,

2018. See SAC.

On February 14, 2020, the Ulster Defendants, the Town Defendants, and the Access

Defendants each filed a motion for summary judgment. See Dkt. Nos. 121 ("Ulster Defendants'

Motion"); Ulster Defs.' Mem. of Law; 122 ("Town Defendants' Motion"); 122-10 ("Town

Defendants' Memorandum of Law"); 123 ("Access Defendants' Motion"); 123-13 ("Access

Defendants' Memorandum of Law").

On April 9, 2020, Plaintiff filed an opposition to each summary judgment motion and

cross-moved for partial summary judgment. See Dkt. Nos. 127; 127-12 ("Plaintiff's Opposition

to Ulster Defendants' Motion"); 127-14 ("Plaintiff's Opposition to Town Defendants'

Motion"); 127-16 ("Plaintiff's Opposition to Access Defendants' Motion").

On May 22, 2020, each set of Defendants filed an opposition to Plaintiff's cross-motion. See Dkt. Nos. 134 ("Ulster Defendants' Reply and Opposition"); 133 ("Ulster Defendants' Counter-Statement of Material Facts"); 135 ("Town Defendants' Reply and Opposition"); 136 ("Town Defendants' Counter-Statement of Material Facts"); 137-1 ("Access Defendants' Reply and Opposition").

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, the movant is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to [the movant's]

case, and on which [the movant] will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 U.S. Dist. LEXIS 169632, at *26 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd.. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV.    DISCUSSION[4]

---

[4] As the Court noted in the March 2018 Order, Plaintiff's third cause of action—for false imprisonment—is identical to the false arrest portion of Plaintiff's first cause of action. See March 2018 Order at 5 n.4. The Court accordingly dismisses the Second Amended Complaint's third

### A.  The Ulster Defendants

#### 1.  *Van Blarcum*[5]

Plaintiff has only an unreasonable search and seizure claim remaining against Van

Blarcum. See SAC at 11; see also supra n.4. Van Blarcum argues that he is entitled to summary

judgment because he was not personally involved in the events of November 19, 2016. See

Ulster Defs.' Mem. of Law at 21–22.[6] Plaintiff argues that Van Blarcum is liable because: (1)

---

cause of action as duplicative. See Hickey v. City of New York, No. 01-CV-6506, 2004 U.S. Dist. LEXIS 23941, at *21 n.3 (S.D.N.Y. Nov. 24, 2004) ("Because the torts of false arrest and false imprisonment are identical, plaintiffs' Third Cause of Action, for false imprisonment . . . is dismissed as duplicative.").

[5]  In its March 2018 Order, the Court dismissed the Amended Complaint's fourth cause of action against Ulster County, see March 2018 Order at 23, and dismissed Plaintiff's official capacity claims against Van Blarcum, see id. at 24, 29. The fourth cause of action was based on Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). After the March 2018 Order, Plaintiff filed the Second Amended Complaint, including the fourth cause of action and listing Van Blarcum as the only defendant for that claim. See SAC at 23. But "in no event does the Monell analysis of governmental policy or practice apply to allegations against someone acting in his or her individual capacity." Amory v. Katz, No. 15-CV-1535, 2016 U.S. Dist. LEXIS 175342, at *12 (D. Conn. Dec. 19, 2016) (citing Kentucky v. Graham, 473 U.S. 159, 167–68 (1985)). Therefore, the fourth cause of action in the Second Amended Complaint is dismissed.

[6]  Van Blarcum initially appeared to have moved for summary judgment on all claims against him. See Ulster Defs.' Mem. of Law at 22 ("As a result, the [SAC] should be dismissed against Paul VanBlarcum as there is no basis for a supervisory liability claim against him and he had no actual involvement in the events."). However, in the Ulster Defendants' Reply and Opposition, Van Blarcum argues that "the Fourth Cause of Action against Van Blarcum should be dismissed and plaintiff's cross motion for judgment against him denied." Ulster Defs.' Reply and Opp'n at 13. As discussed supra, n.5, the Court dismisses the fourth cause of action against Van Blarcum, which had been based on Monell. But even assuming Van Blarcum failed to move for summary judgment on all claims, Federal Rule of Civil Procedure 56(f) gives the Court the ability to grant summary judgment on its own, provided the non-moving party has "notice and a reasonable time to respond." See Fed. R. Civ. P. 56(f). Courts have examined "the totality of the proceedings to determine whether the losing party had sufficient notice of the possibility that summary judgment could be granted against it." Smith v. Perkins Bd. of Educ., 708 F.3d 821 (6th Cir. 2013) (quoting Turcar, LLC v. IRS, 451 Fed. App'x 509, 513 (6th Cir. 2011)). Here, Plaintiff responded to Van Blarcum's opening brief, which stated without qualification that "Van Blarcum

he was grossly negligent in supervising Maguire, his subordinate; and (2) he did not try to learn about or remedy the alleged wrong. See Pl.'s Opp'n to Ulster Defs.' Mot. at 31–32. The Court agrees that Van Blarcum was not personally involved in the alleged constitutional violations. Therefore, the Court grants summary judgment to Van Blarcum on the remaining claim against him and denies Plaintiff's cross-motion for partial summary judgment on the personal involvement issue.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a custom or policy under which unconstitutional policies occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

In Colon, the Second Circuit granted summary judgment to a supervisor alleged to have

_____

is entitled to summary judgment" and "the [SAC] should be dismissed against Paul VanBlarcum." See Ulster Defs.' Mem. of Law at 21–22. The Court finds this unequivocal language sufficiently put Plaintiff on notice such that the Court can consider whether Van Blarcum is entitled to summary judgment on all claims against him.

been grossly negligent in "training and supervising the corrections officers under his

management." Id. The Second Circuit noted that the plaintiff had failed to set forth facts

supporting a claim that the supervisor-defendant either knew or should have known of the

relevant events. Id. at 873–74. "In the absence of such facts, there is no basis for a jury finding

of gross negligence (or deliberate indifference), and summary judgment is proper." Id. at 874.

Here, too, there is no support for a jury finding of gross negligence or deliberate

indifference on the part of Van Blarcum. Plaintiff does not dispute Van Blarcum's contention

that he did not direct or advise Maguire on how to respond to Plaintiff's reports. See Pl.'s

Response to Ulster Defendants' SMF ¶ 80; Ulster Defs.' SMF ¶ 3. Nor does Plaintiff counter

Van Blarcum's statement that he did not speak to Maguire before, during, or after Maguire's

response to Plaintiff's property on November 19, 2016. See Pl.'s Response to Ulster

Defendants' SMF ¶ 79 Ulster Defs.' SMF ¶ 79; Dkt. No. 121-18 ("Van Blarcum Affidavit") ¶

3.

Instead, Plaintiff focuses on Van Blarcum's access to information regarding the

November 29, 2016 incident and ability to discipline Maguire for his role in it. See Pl.'s

Response to Ulster Defendants' SMF ¶ 79; see also Pl.'s Opp'n to Ulster Defs.' Mot. at 32

("Sheriff Van Blarcum testified that he could have discovered what happened, and had the

authority to sanction any deputy."). But Plaintiff "offers no expert opinion that anything that

VanBlarcum or the UCSO did or did not do deviated from a norm of conduct for a sheriff or

agency in similar circumstances." Ulster Defs.' Reply and Opp'n to Pl.'s Cross-Mot. at 12.

Where the record "does not evidence any blameworthy conduct", supervisory liability is

inappropriate. See, e.g., Clintron v. Shauwecker, No. 05-CV-333, 2008 U.S. Dist. LEXIS

13

18825, at *16 (D. Vt. Mar. 6, 2008) (granting summary judgment to supervisor-defendant on claim of grossly negligent supervision).

In countering Van Blarcum's argument that he is entitled to summary judgment, Plaintiff cites to an allegation in the Second Amended Complaint that Van Blarcum "permitted and tolerated the practice of warrantless detention, illegal search, illegal seizure, and involuntary confinement of individuals and warrantless entry and search of residences of individuals believed to have made a false report." See Pl.'s Opp'n to Ulster Defs.' Mot. at 31–32 (citing SAC ¶ 150). But unsworn allegations in a complaint are insufficient to defeat a motion for summary judgment. See, e.g., Zayas v. Caring Cmty. of Conn., No. 11-CV-442, 2012 U.S. Dist. LEXIS 141698, at *17 (D. Conn. Oct. 1, 2012). And conclusory allegations such as this one are also insufficient to overcome a summary judgment motion. See, e.g., Censor v. ASC Techs. of Conn., LLC, 900 F. Supp. 2d 181, 216 (D. Conn. 2012).

Because Plaintiff has failed to create a genuine dispute of material fact as to whether Van Blarcum was personally involved in the allegedly unconstitutional search and seizure, Van Blarcum is entitled to summary judgment. Plaintiff's cross-motion is denied to the extent it seeks summary judgment on Van Blarcum's personal involvement.

### 2.  Maguire

Plaintiff also has only an unreasonable search and seizure claim remaining against Maguire. See SAC at 11; see also supra n.4. Maguire argues that he is entitled to qualified immunity. See Ulster Defs.' Mem. of Law at 23. The Court agrees.

"When facing a defense of qualified immunity at the summary judgment stage, 'a court should ask whether, viewing the evidence in the light most favorable to the non-moving party,

the conduct that may be proved at trial is conduct that, at the time it occurred, violated a clearly established constitutional or statutory right.'" Ruhlmann v. Ulster County Dep't of Soc. Servs., 234 F. Supp. 2d 140, 174 (N.D.N.Y. 2002) (quoting Mozzochi v. Borden, 959 F.2d 1174, 1178 (2d Cir. 1992)). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012). "[W]here plaintiff has a clearly established constitutional or statutory right, the only remaining inquiry is whether the defendant's conduct is objectively reasonable." Ruhlmann, 234 F. Supp. 2d at 174 (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "Though mistaken judgments reasonably arrived at are protected, qualified immunity does not protect an official against redress for performance that was plainly incompetent." Rodriguez v. City of New York, 72 F.3d 1051, 1065 (2d Cir. 1995). Probable cause is required for an MHL confinement, see, e.g., Roache v. v. McCulloch, No. 17-CV-574, 2019 U.S. Dist. LEXIS 155442, at *14 (N.D.N.Y. Sept. 12, 2019), but for qualified immunity to attach, only "arguable probable cause" must be found, see Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) ("Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.").

As discussed in the March 2018 Order, Plaintiff asserts a cause of action for unreasonable search and seizure, see SAC at 11, but "does not clearly state the legal theories underlying" this claim, see March 2018 Order at 5. Just as in the March 2018 Order, the Court will analyze this cause of action as both an allegedly false arrest of Plaintiff and an allegedly unreasonable search of her home to locate the firearm. See id. at 5–21.

15

a.  Plaintiff's Confinement

The right Plaintiff alleges Maguire violated—the right to be free from false arrest—is clearly established. See Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987). The relevant inquiry, then, is whether Maguire's conduct was "objectively reasonable"; if so, he is entitled to qualified immunity. See Ruhlmann, 234 F. Supp. 2d at 174.

Maguire asserts—and Plaintiff does not dispute—that he relied heavily on Matthew Maher's opinion in deciding to invoke MHL § 9.41. See Maguire Aff. ¶ 13. In fact, Maguire swore that he might not have arrested Plaintiff and had her taken to the hospital were it not for the advice of MMH. See id. The Court finds that Maguire's reliance on the on-scene mental health professionals was "objectively reasonable," entitling him to qualified immunity.

This case is analogous to Cruz v. City of New Rochelle, No. 13-CV-7432, 2017 U.S. Dist. LEXIS 63832 (S.D.N.Y. Apr. 3, 2017). In Cruz, the court granted summary judgment to individual defendants on the basis of qualified immunity. See id. at *56. There, an officer-defendant called a hospital representative to request authorization under MHL § 9.45 to take the plaintiff to the hospital. See id. at *22. The representative instructed the officer-defendant to bring the plaintiff in. See id. at *23. The court concluded that, "[b]ased on the totality of the circumstances . . . including in particular the instruction given to [the officer-defendant] by the hospital representative, after she consulted with the physician on duty, to bring Cruz to the hospital, it would not have been objectively unreasonable for an officer to conclude that he or she could and should enter Cruz's apartment in order to do so." Id. at *58.

Under Second Circuit precedent, certain types of evidence can justify a defendant-officer's reliance on the opinion of an on-site mental health professional. See Myers v.

Patterson, 819 F.3d 625, 634 (2d Cir. 2016). In Myers, the Second Circuit reversed and remanded the district court's grant of qualified immunity to a defendant-officer because the record did not yet support a finding that the defendant-officer acted reasonably in seizing the plaintiff for psychiatric evaluation. See id. at 636. The Second Circuit instructed the district court that "reasonableness could be based on either of two sets of circumstances, or any combination of them[.]" Id. at 634. First, reasonableness could be found based on information possessed by the defendant-officer suggesting there was a "substantial risk of serious physical harm." Id. Second, reasonableness could be supported by an on-site caseworker's "communication of her professional judgment that [the arrestee] should be seized for psychiatric evaluation." Id. In other words, the officer "is protected by qualified immunity" if a mental health professional "somehow communicated to him a message that [the officer] could have reasonably understood as" an expression of the professional's opinion that the subject should be seized for psychiatric evaluation. Id.

Here, while the undisputed record does not indicate that there was a "substantial risk of serious physical harm,"[7] it does present the other indicator of reasonableness endorsed by the Second Circuit. Maguire relied upon on-site mental health professionals who indicated that the situation justified the use of the MHL's procedures. See Maguire Aff. ¶ 13.

Plaintiff emphasizes that Matthew Maher could not invoke MHL § 9.41 because that

---

[7] TPPD concluded just three days earlier that Plaintiff "did not seem to be a danger [to herself] or others at this time." See TPPD Records at 15. Maguire was apparently "very concerned due to the presence of a weapon on the property," Maguire Aff. ¶ 11, but there is no indication that Plaintiff threatened to use the weapon or otherwise harm herself or others. And as the Second Circuit wrote in Myers, "[a] person may be annoyed, uncooperative, and irrational without presenting a danger to herself or of violence to others." Myers, 819 F.3d at 634.

statute can only be utilized by law enforcement. See Pl.'s Opp'n to the Ulster Defs.' Mot. at 33 ("[Maguire] had made several arrests based upon MHL 9.41, and knew that it was a police decision."). But even though Matthew Maher had no power under MHL§ 9.41, Maguire could still rely on his input. See Myers, 819 F.3d at 634–35 ("Even if, in actuality, [the caseworker] did not possess the authority . . .  to make the judgment, [the defendant-officer] would nonetheless be shielded by qualified immunity if a reasonable officer in the circumstances would have relied on [the caseworker's] directive and seeming knowledge.").

Because Maguire reasonably relied upon MMH's opinion that Plaintiff should have been seized for psychiatric evaluation, qualified immunity protects him.

### b.  Search of Plaintiff's Home

The Court also concludes that Maguire is protected by qualified immunity for re-entering Plaintiff's home to seize her firearm. First, the right Plaintiff claims Maguire violated—the right to be free from weapons searches at a home-operated daycare—is not "clearly established." Second, the right to be free from home searches is also undefined in the mental health context, and therefore "officers of reasonable competence could disagree," Escalera, 361 F.3d at 743, on whether the re-entry was legal. Third, as with the decision to confine Plaintiff, Maguire relied on the advice of another.

The Court begins its analysis of whether Maguire is immune for his warrantless search of Plaintiff's home by examining the "contours" of the right Plaintiff alleges was violated to see if they are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "To determine whether the relevant law was clearly established, we consider the specificity with which a right is

defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." Terebesi v. Torreso, 764 F.3d 217, 231 (2d Cir. 2014). "Although there need not be 'a case directly on point,' it must nonetheless be clear that 'existing precedent [has] placed the . . . constitutional question beyond debate.'" McEvoy v. Matthews, No. 16-CV-922, 2017 U.S. Dist. LEXIS 133487, at *8 (D. Conn. Aug. 21, 2017) (quoting Mullenix v. Luna, 577 U.S. 7, 12 (2015)).

One federal court of appeals observed that, as of a challenged 2011 search, "no decision of this court or the Supreme Court had addressed, even generally, whether a warrant was required for the search of a home out of which a state-regulated day care was operated." Hall v. Sweet, 666 Fed. App'x 469, 480 (6th Cir. 2016). The parties do not identify, and the Court has not uncovered, any decision since then addressing this scenario—an officer conducting a warrantless search of a home out of which a daycare was run. "Given this lack of certainty in Fourth Amendment's applicability to the circumstances," see id., a reasonable officer in Maguire's position could not be fully aware of whether his conduct violated the law.

The fact that this lawsuit arises in the context of an MHL confinement further confuses the analysis. This is because "the law concerning probable cause in the mental health context is not clearly established[.]" Housley v. Holquist, 879 F. Supp. 2d 472, 482 (D. Md. 2011) (finding an officer who conducted a warrantless entry was entitled to qualified immunity for a mental health seizure).  An officer can be immune even where a search or seizure is "technically unlawful," as long as he acts reasonably. See id.

The Court finally turns to Maguire's reliance upon his supervisor's instructions. The Second Circuit has held that a subordinate officer is entitled to qualified immunity when he

relies on a supervisor's "apparently valid" order. See Varrone v. Bilotti, 123 F.3d 75, 82 (2d Cir. 1997); see also Goode v. Winkler, No. 97-CV-8999, 1999 U.S. Dist. LEXIS 18132, at *18 (S.D.N.Y. Nov. 22, 1999) (granting summary judgment on an excessive force claim to a defendant-officer who relied on a superior's orders in using a distraction device to apprehend suspects). Maguire asserts that he contacted his supervisor, UCSO Lieutenant Budd, to seek advice "with respect to [Plaintiff's] firearm because he had never dealt with someone in such an emotional[ly] distraught state who also possessed a firearm." Ulster Defs.' SMF ¶ 137.[8] In contacting Budd, Maguire was apparently following UCSO protocol. See Van Blarcum Aff. ¶ 5. Budd instructed Maguire to seize Plaintiff's weapon. See Ulster Defs.' SMF ¶ 138; see also Maguire Dep. at 46 ("[Budd] just said that we need to take the gun."); Dkt. 127-7 ("Raftery Affidavit") ¶ 16.

Thus, qualified immunity applies under Second Circuit precedent if Budd's order—that Maguire seize Plaintiff's weapon in connection with her confinement pursuant to MHL § 9.41—was "apparently valid." Though courts have not defined what makes an order from a superior "apparently valid," the inquiry is fact-specific. See, e.g., Anthony v. City of New York, 339 F.3d 129, 138 (noting that an order was apparently valid "in light of the substance of the 911 call and all of the surrounding circumstances known to" the officers). The Court concludes that Budd's order was indeed "apparently valid" because it arose in the context of an MHL

---

[8]  Plaintiff denies this fact, citing Maguire's years of law enforcement experience and his training on the use of warrants. See Pl.'s Resp. to Ulster Defs.' SMF ¶ 137. Because this denial does not specifically contradict the Ulster Defendants' statement—that Maguire had never dealt with such a distraught individual who owned a gun—the Court deems the Ulster Defendants' statement admitted by Plaintiff. See L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

confinement, not in the context of a traditional arrest.

In sum, the Court decides Maguire is immune for searching Plaintiff's home after confining her for three reasons. First, there is no "clearly established" right to be free from even warrantless searches of a home out of which a daycare is operated. Second, the right is further clouded by uncertainty surrounding probable cause in mental health contexts. Lastly, in searching Plaintiff's home for the firearm, Maguire relied on an "apparently valid" order from a superior. The Court therefore grants summary judgment to Maguire.

### B. The Town Defendants

#### 1. Ryan[9, 10]

Like Van Blarcum, Ryan argues that he is entitled to summary judgment because he was not personally involved in the events of November 19, 2016. See Town Defs.' Mem. of Law at 14. Again, the Court agrees.

The parties agree that Ryan was not present at Plaintiff's property on November 19,

---

[9] In its March 2018 Order, the Court dismissed the Amended Complaint's fifth cause of action against the Town of Plattekill, see March 2018 Order at 23, and dismissed Plaintiff's official capacity claims against Ryan, see id. at 24, 29. The fifth cause of action was based on Monell, 436 U.S. 658. After the March 2018 Order, Plaintiff filed the Second Amended Complaint, including the fifth cause of action and listing Ryan as the only defendant for that claim. See SAC at 25. But "in no event does the Monell analysis of governmental policy or practice apply to allegations against someone acting in his or her individual capacity." Amory v. Katz, No. 15-CV-1535, 2016 U.S. Dist. LEXIS 175342, at *12 (D. Conn. Dec. 19, 2016) (citing Kentucky v. Graham, 473 U.S. 159, 167–68 (1985)). Therefore, the fifth cause of action contained in the Second Amended Complaint is dismissed.

[10] Ryan is not named as a defendant in any cause of action besides the fifth, which the Court has dismissed, see supra n.9. See generally SAC. Nevertheless, because "a fair reading of the claim suggests" that Ryan was intended to be included as a defendant on the first cause of action for unreasonable search and seizure, the Court analyzes whether Ryan is entitled to summary judgment on that claim. Marr v. Me. Dep't of Human Servs.,No. 01-CV-224, 2002 U.S. Dist. LEXIS 7378, at *3 n.1 (D. Me. Apr. 24, 2002).

2016. See Town Defendants' SMF ¶ 69; Dkt. No. 127-13 ("Plaintiff's Response to Town

Defendants' SMF") ¶ 69. Ryan did not learn of the events until the next day. See Town

Defendants' SMF ¶ 68. Nevertheless, Plaintiff argues Ryan is liable because he was grossly

negligent in supervising Raftery and Benjamin and because he eventually learned of the events

and "did nothing to remedy the unconstitutional acts occurring." See Pl.'s Opp'n to the Town

Defs.' Mot. at 32–33. But the record "does not evidence any blameworthy conduct," making

supervisory liability inappropriate. See, e.g., Clintron, 2008 U.S. Dist. LEXIS 18825, at *16.

And Plaintiff's failure-to-remedy argument fails because the alleged violations occurred a full

day before Ryan learned of them. See Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y.

2008) ("If the official is confronted with a violation that has already occurred and is not

ongoing, then the official will not be found personally responsible for failing to 'remedy' a

violation.").

    Plaintiff again cites to the Second Amended Complaint to show Ryan "permitted and

tolerated the practice of warrantless detention, illegal search, illegal seizure, and involuntary

confinement of individuals and warrantless entry and search of residences of individuals

believed to have made a false report." See Pl.'s Opp'n to Town Defs.' Mot. at 32 (citing SAC ¶

150). But, as stated in the Van Blarcum discussion, unsworn allegations in a complaint are

insufficient to defeat a motion for summary judgment. See Zayas, 2012 U.S. Dist. LEXIS

141698, at *17. And, again, conclusory allegations are also insufficient to overcome a summary

judgment motion. See, e.g., Censor, 900 F. Supp. 2d at 216.

    Because Plaintiff has failed to create a genuine dispute of material fact as to whether

Ryan was personally involved in the alleged constitutional violations, the Court grants Ryan

summary judgment. Plaintiff's cross-motion is denied to the extent it seeks summary judgment on Ryan's personal involvement.

### 2. Benjamin

Plaintiff has only an unreasonable search and seizure claim remaining against Benjamin. See supra n.4 (explaining that Plaintiff's third cause of action is dismissed as duplicative). As with the Maguire discussion, the Court will analyze this cause of action as both an allegedly false arrest of Plaintiff and an allegedly unreasonable search of her home to locate the firearm.

Benjamin argues that: (1) Plaintiff does not have a viable Fourth Amendment claim against him because exceptions to the warrant requirement applied; (2) Plaintiff's confinement was privileged under MHL § 9.41; (3) he was not personally involved in the allegedly unlawful search of Plaintiff's home; and (4) he is entitled to qualified immunity. See Town Defs.' Mem. of Law at 2–3. The Court finds that Benjamin is immune for his role in Plaintiff's confinement and was not personally involved in the post-confinement search. Accordingly, the claim against him is dismissed.

### a.  Plaintiff's Confinement

As with Maguire, the right Plaintiff alleges Benjamin violated—the right to be free from false arrest—is clearly established. See Robinson, 821 F.2d at 921. This leaves whether Benjamin's conduct was "objectively reasonable" as the only remaining inquiry in the qualified immunity analysis. Because the Court concludes Benjamin acted reasonably under the circumstances in confining Plaintiff, he is immune.

As discussed above, the Second Circuit has held that a subordinate officer is entitled to qualified immunity when he relies on a supervisor's "apparently valid" order. See Varrone, 123

F.3d at 82 (2d Cir. 1997). While Maguire was the subordinate in the context of his decision to seize Plaintiff's firearm, he was Benjamin's supervisor in the combined UCSO and TPPD response to Plaintiff's property on November 19, 2016. See Dkt. No. 122-6 ("Benjamin Affidavit") ¶ 9 ("Deputy Maguire was the Officer in Charge at the scene and, as such, had command and control. I responded for the sole purpose of providing assistance to the [UCSO] Officer in Charge, under his command and orders."). The fact that Maguire—being employed by UCSO—was not technically Benjamin's supervisor is not relevant to the qualified immunity analysis. See Anthony, 339 F.3d at 138 ("Plausible instructions from a superior *or fellow officer* support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (e.g. a warrant, probable cause, exigent circumstances).") (emphasis added).

Because Benjamin acted objectively reasonably in relying upon Maguire in the decision to confine Plaintiff, he is protected by qualified immunity.

### b.  Search of Plaintiff's Home

Benjamin is entitled to summary judgment on the portion of Plaintiff's unreasonable search and seizure claim against him that relates to the retrieval of the firearm. As discussed with regard to Van Blarcum and Ryan, personal involvement is a prerequisite for § 1983 damages. See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). The parties agree that Benjamin did not participate in the post-confinement firearm retrieval. See Town Defs.' SMF ¶ 57; Pl.'s Resp. to Town Defs.' SMF ¶ 57. Plaintiff does not contest the Town Defendants' contention that Benjamin is entitled to summary judgment on the weapon search on the ground

that he was not personally involved. See generally Pl.'s Opp'n to Town Defs.' Mot. Accordingly, the Court grants Benjamin summary judgment on this issue.

### 3. Raftery

Plaintiff also has only an unreasonable search and seizure claim remaining against Raftery. See supra n.4 (explaining that Plaintiff's third cause of action is dismissed as duplicative). As above, the Court will analyze this cause of action as both an allegedly false arrest of Plaintiff and an allegedly unreasonable search of her home to locate the firearm.

### a. Plaintiff's Confinement

The Court incorporates its analysis of Benjamin's role in Plaintiff's confinement and also concludes that Raftery is entitled to qualified immunity for his role. Like Benjamin, Raftery stood in the doorway of Plaintiff's home while Maguire entered to confine Plaintiff. See Town Defendants' SMF ¶ 46. Plaintiff admits that Raftery "followed Maguire because he was the lead officer[.]" Pl.'s Opp'n to the Town Defs.' Mot. at 34. As with Benjamin, Raftery acted objectively reasonably in relying on "apparently valid" orders from Maguire, the officer in charge of the coordinated response between UCSO and TPPD. See Raftery Aff. ¶¶ 8–10, 14.

### b. Search of Plaintiff's Home

Like Maguire and unlike Benjamin, Raftery was involved in the post-confinement firearm search of Plaintiff's home. See Raftery Aff. ¶ 17. With regard to the weapon search, Raftery again relied on "apparently valid" directions from Maguire. See id. ¶¶ 17–18. In Goode, a court in this Circuit granted summary judgment on qualified immunity grounds to a subordinate officer for merely following instructions. 1999 U.S. Dist. LEXIS 18132, at *18. This Court reaches the same result, dismissing the remaining claim against Raftery.

25

### C.  The Access Defendants

Plaintiff asserts: (1) an unreasonable search and seizure claim against all of the Access Defendants; and (2) a <u>Monell</u> claim against Access and Anderson-Winchell. The Access Defendants argue these claims should be dismissed because they are not state actors or, if they are state actors, because they are immune. <u>See</u> Dkt. No. 123-13 ("Access Defendants' Memorandum of Law") at 9, 19. The Court agrees that the Access Defendants are not state actors and accordingly dismisses the claims against them.

"Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." <u>Flagg v. Yonkers Sav. & Loan Ass'n</u>, 393 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action." <u>Tancredi v. Metro. Life Ins. Co.</u>, 316 F.3d 308, 312 (2d Cir. 2003); <u>see also</u> <u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 295 n.2 ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes.").

In a § 1983 action, courts utilize three tests in assessing whether "the actions of a nominally private entity are attributable to the state[.]" <u>Sybalski v. Indep. Grp. Home Living Program, Inc.</u>, 546 F.3d 255, 257 (2d Cir. 2008). The first—the compulsion test—asks whether "the entity act[ed] pursuant to the coercive power of the state or is controlled by the state[.]" <u>Id.</u> The second—the close nexus test—asks if the state "provide[d] significant encouragement to the entity, the entity is a willing participant in joint activity with the state, or the entity's

26

functions are entwined with state policies[.]" <u>Id.</u> Finally, the third test asks if "the entity has been delegated a public function by the state[.]" <u>Id.</u> "The principal inquiry . . . is whether the party's actions may be 'fairly attributable to the state.'" <u>Wolotsky v. Huhn</u>, 960 F.2d 1331, 1335 (6th Cir. 1992) (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

"The existence of a contract does not by itself 'render all of the contractor's conduct state action[.]'" <u>Stegemann v. Rensselaer Cty. Sheriff's Office</u>, No. 15-CV-21, 2020 U.S. Dist. LEXIS 168100, at *14 (N.D.N.Y. Sept. 15, 2020) (quoting <u>Cooper v. United States Postal Serv.</u>, 577 F.3d 479, 492 (2d Cir. 2009)); <u>see also</u> <u>Doe v. Rosenberg</u>, 996 F.Supp. 343, 352 (S.D.N.Y. 1998) (hospital's contract with state agency to operate a psychiatric wing insufficient to render it a state actor), <u>aff'd</u> 166 F.3d 507 (2d Cir. 1999); <u>but see</u> <u>McCullum v. Tepe</u>, No. 08-CV-387, 2011 U.S. Dist. LEXIS 171206, at *30 (S.D. Ohio Mar. 28, 2011) (finding that a private, non-profit corporation that contracted with a county to provide mental health services and its employee were state actors).

The Access Defendants do not qualify as state actors under any of the afore-mentioned tests. This case is analogous to <u>Pino v. Higgs</u>, in which a federal appeals court found that a therapist had not engaged in state action. <u>See</u> 75 F.3d 1461 (10th Cir. 1996); <u>see also</u> <u>Gessner v. Mazzitti</u>, No. 12-CV-2185, 2013 U.S. Dist. LEXIS 103644, at *23 (M.D. Pa. June 17, 2013) ("The state action requirement of § 1983 has been construed to preclude federal civil rights claims against private mental health counseling services.") (collecting cases). In <u>Pino</u>, the therapist instructed an officer to detain and transport the appellant to a hospital for psychiatric evaluation. <u>See</u> 75 F.3d at 1465. The Tenth Circuit reasoned that the therapist "did nothing more than provide information which the police officers . . . may have considered in making

their independent judgments." Id. at 1466. The therapist's "position with a non-public organization . . . while lending credibility to her opinion, carries with it no special state-generated authority that would make her conduct attributable to the state." Id.

As in Pino, a mental health professional—Matthew Maher— influenced the police's decision to confine Plaintiff. See Maguire Aff. ¶ 13. But that decision was ultimately law enforcement's, not Access', to make. See MHL § 9.41 ("Any . . . *police officer* . . . may take into custody any person who appears to be mentally ill . . . .") (emphasis added). Because the statute empowers only law enforcement to act, the Court rejects Plaintiff's contention that there was the requisite "joint activity" here. The Access Defendants' expression of an opinion is therefore not "fairly attributable to the state." Wolotsky, 960 F.2d at 1335 (quoting Lugar, 457 U.S. at 937). Because the Court finds the Access Defendants are not state actors, it grants them summary judgment and denies Plaintiff's cross-motion on this issue.

Having concluded that the Access Defendants did not engage in state action, the Court must also dismiss the Monell claim against Access and Anderson-Winchell. See, e.g., Watson v. Methacton Sch. Dist., 513 F. Supp. 2d 360 (E.D. Pa. 2007) ("The court finds that Plaintiff's Monell allegation cannot survive the motion for summary judgment for several reasons. First, since the court has found that there was no state action, it follows that Plaintiff cannot establish that a policy, practice or custom of the state caused her to suffer a constitutional injury.").

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Ulster Defendants' Motion (Dkt. No. 121), the Town Defendants'

Motion (Dkt. No. 122), and the Access Defendants' Motion (Dkt. No. 123) are **GRANTED**;

and it is further

     **ORDERED**, that Plaintiff's cross-motion for partial summary judgment (Dkt. No. 127)

is **DENIED in its entirety**; and it is further

     **ORDERED**, that Plaintiff's Second Amended Complaint (Dkt. No. 71) is

**DISMISSED**; and it is further

     **ORDERED**, that the Clerk close this action; and it is further

     **ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-

Decision and Order on all parties in accordance with the Local Rules.

     **IT IS SO ORDERED.**[11]

DATED:     November 24, 2020
             Albany, New York

Lawrence E. Kahn
U.S. District Judge

---

[11] Due to the delays and disruptions caused by the COVID-19 pandemic, some cases/motions were not disposed of prior to the end of the reporting period.

29